**Exhibit 18:** *Strickland v. Washington*, 466 U.S. 668 (1984)

Syllabus                      466 U. S.

## STRICKLAND, SUPERINTENDENT, FLORIDA STATE PRISON, ET AL. *v.* WASHINGTON

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 82–1554.  Argued January 10, 1984—Decided May 14, 1984

Respondent pleaded guilty in a Florida trial court to an indictment that included three capital murder charges.  In the plea colloquy, respondent told the trial judge that, although he had committed a string of burglaries, he had no significant prior criminal record and that at the time of his criminal spree he was under extreme stress caused by his inability to support his family.  The trial judge told respondent that he had "a great deal of respect for people who are willing to step forward and admit their responsibility."  In preparing for the sentencing hearing, defense counsel spoke with respondent about his background, but did not seek out character witnesses or request a psychiatric examination.  Counsel's decision not to present evidence concerning respondent's character and emotional state reflected his judgment that it was advisable to rely on the plea colloquy for evidence as to such matters, thus preventing the State from cross-examining respondent and from presenting psychiatric evidence of its own.  Counsel did not request a presentence report because it would have included respondent's criminal history and thereby would have undermined the claim of no significant prior criminal record. Finding numerous aggravating circumstances and no mitigating circumstance, the trial judge sentenced respondent to death on each of the murder counts.  The Florida Supreme Court affirmed, and respondent then sought collateral relief in state court on the ground, *inter alia*, that counsel had rendered ineffective assistance at the sentencing proceeding in several respects, including his failure to request a psychiatric report, to investigate and present character witnesses, and to seek a presentence report.  The trial court denied relief, and the Florida Supreme Court affirmed.  Respondent then filed a habeas corpus petition in Federal District Court advancing numerous grounds for relief, including the claim of ineffective assistance of counsel.  After an evidentiary hearing, the District Court denied relief, concluding that although counsel made errors in judgment in failing to investigate mitigating evidence further than he did, no prejudice to respondent's sentence resulted from any such error in judgment.  The Court of Appeals ultimately reversed, stating that the Sixth Amendment accorded criminal defendants a right

STRICKLAND *v.* WASHINGTON          669

668                                   Syllabus

to counsel rendering "reasonably effective assistance given the totality of
the circumstances."   After outlining standards for judging whether a
defense counsel fulfilled the duty to investigate nonstatutory mitigating
circumstances and whether counsel's errors were sufficiently prejudicial
to justify reversal, the Court of Appeals remanded the case for applica-
tion of the standards.

*Held:*
    1.  The Sixth Amendment right to counsel is the right to the effective
assistance of counsel, and the benchmark for judging any claim of ineffec-
tiveness must be whether counsel's conduct so undermined the proper
functioning of the adversarial process that the trial cannot be relied on as
having produced a just result.   The same principle applies to a capital
sentencing proceeding—such as the one provided by Florida law—that is
sufficiently like a trial in its adversarial format and in the existence of
standards for decision that counsel's role in the proceeding is comparable
to counsel's role at trial.   Pp. 684–687.
    2.  A convicted defendant's claim that counsel's assistance was so de-
fective as to require reversal of a conviction or setting aside of a death
sentence requires that the defendant show, first, that counsel's perform-
ance was deficient and, second, that the deficient performance prejudiced
the defense so as to deprive the defendant of a fair trial.   Pp. 687–696.
    (a)  The proper standard for judging attorney performance is that
of reasonably effective assistance, considering all the circumstances.
When a convicted defendant complains of the ineffectiveness of counsel's
assistance, the defendant must show that counsel's representation fell
below an objective standard of reasonableness.   Judicial scrutiny of
counsel's performance must be highly deferential, and a fair assessment
of attorney performance requires that every effort be made to eliminate
the distorting effects of hindsight, to reconstruct the circumstances of
counsel's challenged conduct, and to evaluate the conduct from counsel's
perspective at the time.   A court must indulge a strong presumption
that counsel's conduct falls within the wide range of reasonable profes-
sional assistance.   These standards require no special amplification in
order to define counsel's duty to investigate, the duty at issue in this
case.   Pp. 687–691.
    (b)  With regard to the required showing of prejudice, the proper
standard requires the defendant to show that there is a reasonable prob-
ability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different.   A reasonable probability is a
probability sufficient to undermine confidence in the outcome.   A court
hearing an ineffectiveness claim must consider the totality of the evi-
dence before the judge or jury.   Pp. 691–696.

670  OCTOBER TERM, 1983

Syllabus  466 U. S.

3. A number of practical considerations are important for the application of the standards set forth above. The standards do not establish mechanical rules; the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. **A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. The principles governing ineffectiveness claims apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. And in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered **effective assistance** is not a finding of fact binding on the federal court to the extent stated by 28 U. S. C. § 2254(d), but **is a mixed question of law and fact.** Pp. 696–698.

4. The facts of this case make it clear that counsel's conduct at and before respondent's sentencing proceeding cannot be found unreasonable under the above standards. They also make it clear that, even assuming counsel's conduct was unreasonable, respondent suffered insufficient prejudice to warrant setting aside his death sentence. Pp. 698–700.

693 F. 2d 1243, reversed.

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 701. MARSHALL, J., filed a dissenting opinion, *post*, p. 706.

*Carolyn M. Snurkowski,* Assistant Attorney General of Florida, argued the cause for petitioners. On the briefs were *Jim Smith,* Attorney General, and *Calvin L. Fox,* Assistant Attorney General.

*Richard E. Shapiro* argued the cause for respondent. With him on the brief was *Joseph H. Rodriguez.**

───────

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *Edwin S. Kneedler;* for the State of Alabama et al. by *Mike Greely,* Attorney General of Montana, and *John H. Maynard,* Assistant Attorney General, *Charles A. Graddick,* Attorney General of Alabama, *Robert K. Corbin,* Attorney General of Arizona, *John Steven Clark,* Attorney General of Arkansas, *John Van de Kamp,* Attorney General of California, *Duane Woodard,* Attorney General of Colorado, *Austin*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to consider the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective.

## I

### A

During a 10-day period in September 1976, respondent planned and committed three groups of crimes, which in-

---

*J. McGuigan*, Chief State's Attorney of Connecticut, *Michael J. Bowers*, Attorney General of Georgia, *Tany S. Hong*, Attorney General of Hawaii, *Jim Jones*, Attorney General of Idaho, *Linley E. Pearson*, Attorney General of Indiana, *Robert T. Stephan*, Attorney General of Kansas, *Steven L. Beshear*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *Stephen H. Sachs*, Attorney General of Maryland, *Francis X. Bellotti*, Attorney General of Massachusetts, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *William A. Allain*, Attorney General of Mississippi, *John D. Ashcroft*, Attorney General of Missouri, *Paul L. Douglas*, Attorney General of Nebraska, *Brian McKay*, Attorney General of Nevada, *Irwin I. Kimmelman*, Attorney General of New Jersey, *Paul Bardacke*, Attorney General of New Mexico, *Rufus L. Edmisten*, Attorney General of North Carolina, *Robert Wefald*, Attorney General of North Dakota, *Anthony Celebrezze, Jr.*, Attorney General of Ohio, *Michael Turpen*, Attorney General of Oklahoma, *Dave Frohnmayer*, Attorney General of Oregon, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *Dennis J. Roberts II*, Attorney General of Rhode Island, *T. Travis Medlock*, Attorney General of South Carolina, *Mark V. Meierhenry*, Attorney General of South Dakota, *William M. Leech, Jr.*, Attorney General of Tennessee, *David L. Wilkinson*, Attorney General of Utah, *John J. Easton*, Attorney General of Vermont, *Gerald L. Baliles*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, *Chauncey H. Browning*, Attorney General of West Virginia, and *Archie G. McClintock*, Attorney General of Wyoming; and for the Washington Legal Foundation by *Daniel J. Popeo*, *Paul D. Kamenar*, and *Nicholas E. Calio*.

*Richard J. Wilson, Charles S. Sims*, and *Burt Neuborne* filed a brief for the National Legal Aid and Defender Association et al. as *amici curiae* urging affirmance.

cluded three brutal stabbing murders, torture, kidnaping, se-
vere assaults, attempted murders, attempted extortion, and
theft.   After his two accomplices were arrested, respondent
surrendered to police and voluntarily gave a lengthy state-
ment confessing to the third of the criminal episodes.   The
State of Florida indicted respondent for kidnaping and mur-
der and appointed an experienced criminal lawyer to repre-
sent him.

  Counsel actively pursued pretrial motions and discovery.
He cut his efforts short, however, and he experienced a sense
of hopelessness about the case, when he learned that, against
his specific advice, respondent had also confessed to the first
two murders.   By the date set for trial, respondent was sub-
ject to indictment for three counts of first-degree murder and
multiple counts of robbery, kidnaping for ransom, breaking
and entering and assault, attempted murder, and conspiracy
to commit robbery.   Respondent waived his right to a jury
trial, again acting against counsel's advice, and pleaded guilty
to all charges, including the three capital murder charges.

  In the plea colloquy, respondent told the trial judge that,
although he had committed a string of burglaries, he had no
significant prior criminal record and that at the time of his
criminal spree he was under extreme stress caused by his in-
ability to support his family.   App. 50–53.   He also stated,
however, that he accepted responsibility for the crimes.
E. g., id., at 54, 57.   The trial judge told respondent that
he had "a great deal of respect for people who are willing
to step forward and admit their responsibility" but that he
was making no statement at all about his likely sentencing
decision.   Id., at 62.

  Counsel advised respondent to invoke his right under Flor-
ida law to an advisory jury at his capital sentencing hearing.
Respondent rejected the advice and waived the right.   He
chose instead to be sentenced by the trial judge without a
jury recommendation.

  In preparing for the sentencing hearing, counsel spoke
with respondent about his background.   He also spoke on

the telephone with respondent's wife and mother, though he
did not follow up on the one unsuccessful effort to meet with
them.   He did not otherwise seek out character witnesses
for respondent.   App. to Pet. for Cert. A265.   Nor did he
request a psychiatric examination, since his conversations
with his client gave no indication that respondent had psycho-
logical problems.   *Id.,* at A266.

Counsel decided not to present and hence not to look fur-
ther for evidence concerning respondent's character and emo-
tional state.   That decision reflected trial counsel's sense of
hopelessness about overcoming the evidentiary effect of re-
spondent's confessions to the gruesome crimes.   See *id.,* at
A282.   It also reflected the judgment that it was advisable
to rely on the plea colloquy for evidence about respondent's
background and about his claim of emotional stress: the plea
colloquy communicated sufficient information about these sub-
jects, and by forgoing the opportunity to present new evi-
dence on these subjects, counsel prevented the State from
cross-examining respondent on his claim and from putting on
psychiatric evidence of its own.   *Id.,* at A223–A225.

Counsel also excluded from the sentencing hearing other
evidence he thought was potentially damaging.   He success-
fully moved to exclude respondent's "rap sheet."   *Id.,* at
A227; App. 311.   Because he judged that a presentence re-
port might prove more detrimental than helpful, as it would
have included respondent's criminal history and thereby
would have undermined the claim of no significant history of
criminal activity, he did not request that one be prepared.
App. to Pet. for Cert. A227–A228, A265–A266.

At the sentencing hearing, counsel's strategy was based
primarily on the trial judge's remarks at the plea colloquy as
well as on his reputation as a sentencing judge who thought it
important for a convicted defendant to own up to his crime.
Counsel argued that respondent's remorse and acceptance of
responsibility justified sparing him from the death penalty.
*Id.,* at A265–A266.   Counsel also argued that respondent
had no history of criminal activity and that respondent com-

mitted the crimes under extreme mental or emotional dis-
turbance, thus coming within the statutory list of mitigating
circumstances.   He further argued that respondent should
be spared death because he had surrendered, confessed, and
offered to testify against a codefendant and because respond-
ent was fundamentally a good person who had briefly gone
badly wrong in extremely stressful circumstances.   The
State put on evidence and witnesses largely for the purpose
of describing the details of the crimes.   Counsel did not
cross-examine the medical experts who testified about the
manner of death of respondent's victims.

   The trial judge found several aggravating circumstances
with respect to each of the three murders.   He found that all
three murders were especially heinous, atrocious, and cruel,
all involving repeated stabbings.   All three murders were
committed in the course of at least one other dangerous and
violent felony, and since all involved robbery, the murders
were for pecuniary gain.   All three murders were committed
to avoid arrest for the accompanying crimes and to hinder
law enforcement.   In the course of one of the murders,
respondent knowingly subjected numerous persons to a
grave risk of death by deliberately stabbing and shooting
the murder victim's sisters-in-law, who sustained severe—in
one case, ultimately fatal—injuries.

   With respect to mitigating circumstances, the trial judge
made the same findings for all three capital murders.   First,
although there was no admitted evidence of prior convictions,
respondent had stated that he had engaged in a course of
stealing.   In any case, even if respondent had no significant
history of criminal activity, the aggravating circumstances
"would still clearly far outweigh" that mitigating factor.
Second, the judge found that, during all three crimes, re-
spondent was not suffering from extreme mental or emo-
tional disturbance and could appreciate the criminality of
his acts.   Third, none of the victims was a participant in,
or consented to, respondent's conduct.   Fourth, respondent's

participation in the crimes was neither minor nor the result of
duress or domination by an accomplice.    Finally, respond-
ent's age (26) could not be considered a factor in mitigation,
especially when viewed in light of respondent's planning of
the crimes and disposition of the proceeds of the various
accompanying thefts.

In short, the trial judge found numerous aggravating cir-
cumstances and no (or a single comparatively insignificant)
mitigating circumstance.    With respect to each of the three
convictions for capital murder, the trial judge concluded: "A
careful consideration of all matters presented to the court im-
pels the conclusion that there are insufficient mitigating cir-
cumstances . . . to outweigh the aggravating circumstances."
See *Washington* v. *State*, 362 So. 2d 658, 663–664 (Fla. 1978)
(quoting trial court findings), cert. denied, 441 U. S. 937
(1979).    He therefore sentenced respondent to death on
each of the three counts of murder and to prison terms for
the other crimes.    The Florida Supreme Court upheld the
convictions and sentences on direct appeal.

### B

Respondent subsequently sought collateral relief in state
court on numerous grounds, among them that counsel had
rendered ineffective assistance at the sentencing proceeding.
Respondent challenged counsel's assistance in six respects.
He asserted that counsel was ineffective because he failed to
move for a continuance to prepare for sentencing, to request
a psychiatric report, to investigate and present character
witnesses, to seek a presentence investigation report, to pre-
sent meaningful arguments to the sentencing judge, and to
investigate the medical examiner's reports or cross-examine
the medical experts.    In support of the claim, respondent
submitted 14 affidavits from friends, neighbors, and relatives
stating that they would have testified if asked to do so.    He
also submitted one psychiatric report and one psychological
report stating that respondent, though not under the influ-

ence of extreme mental or emotional disturbance, was "chronically frustrated and depressed because of his economic dilemma" at the time of his crimes.   App. 7; see also *id.*, at 14.

The trial court denied relief without an evidentiary hearing, finding that the record evidence conclusively showed that the ineffectiveness claim was meritless.   App. to Pet. for Cert. A206–A243.   Four of the assertedly prejudicial errors required little discussion.   First, there were no grounds to request a continuance, so there was no error in not requesting one when respondent pleaded guilty.   *Id.*, at A218–A220.   Second, failure to request a presentence investigation was not a serious error because the trial judge had discretion not to grant such a request and because any presentence investigation would have resulted in admission of respondent's "rap sheet" and thus would have undermined his assertion of no significant history of criminal activity.   *Id.*, at A226–A228.   Third, the argument and memorandum given to the sentencing judge were "admirable" in light of the overwhelming aggravating circumstances and absence of mitigating circumstances.   *Id.*, at A228.   Fourth, there was no error in failure to examine the medical examiner's reports or to cross-examine the medical witnesses testifying on the manner of death of respondent's victims, since respondent admitted that the victims died in the ways shown by the unchallenged medical evidence.   *Id.*, at A229.

The trial court dealt at greater length with the two other bases for the ineffectiveness claim.   The court pointed out that a psychiatric examination of respondent was conducted by state order soon after respondent's initial arraignment. That report states that there was no indication of major mental illness at the time of the crimes.   Moreover, both the reports submitted in the collateral proceeding state that, although respondent was "chronically frustrated and depressed because of his economic dilemma," he was not under the influence of extreme mental or emotional disturbance.   All three

STRICKLAND *v.* WASHINGTON                677

reports thus directly undermine the contention made at the
sentencing hearing that respondent was suffering from ex-
treme mental or emotional disturbance during his crime
spree.   Accordingly, counsel could reasonably decide not to
seek psychiatric reports; indeed, by relying solely on the plea
colloquy to support the emotional disturbance contention,
counsel denied the State an opportunity to rebut his claim
with psychiatric testimony.   In any event, the aggravating
circumstances were so overwhelming that no substantial
prejudice resulted from the absence at sentencing of the
psychiatric evidence offered in the collateral attack.

    The court rejected the challenge to counsel's failure to de-
velop and to present character evidence for much the same
reasons.   The affidavits submitted in the collateral proceed-
ing showed nothing more than that certain persons would
have testified that respondent was basically a good person
who was worried about his family's financial problems.   Re-
spondent himself had already testified along those lines at the
plea colloquy.   Moreover, respondent's admission of a course
of stealing rebutted many of the factual allegations in the affi-
davits.   For those reasons, and because the sentencing judge
had stated that the death sentence would be appropriate
even if respondent had no significant prior criminal history,
no substantial prejudice resulted from the absence at sen-
tencing of the character evidence offered in the collateral
attack.

    Applying the standard for ineffectiveness claims articu-
lated by the Florida Supreme Court in *Knight* v. *State*, 394
So. 2d 997 (1981), the trial court concluded that respondent
had not shown that counsel's assistance reflected any sub-
stantial and serious deficiency measurably below that of com-
petent counsel that was likely to have affected the outcome
of the sentencing proceeding.   The court specifically found:
"[A]s a matter of law, the record affirmatively demonstrates
beyond any doubt that even if [counsel] had done each of the
. . . things [that respondent alleged counsel had failed to do]

at the time of sentencing, there is not even the remotest
chance that the outcome would have been any different.
The plain fact is that the aggravating circumstances proved
in this case were completely *overwhelming* . . . ."  App. to
Pet. for Cert. A230.

The Florida Supreme Court affirmed the denial of relief.
*Washington* v. *State*, 397 So. 2d 285 (1981).   For essentially
the reasons given by the trial court, the State Supreme Court
concluded that respondent had failed to make out a prima
facie case of either "substantial deficiency or possible preju-
dice" and, indeed, had "failed to such a degree that we
believe, to the point of a moral certainty, that he is entitled
to no relief . . . ."  *Id.*, at 287.   Respondent's claims were
"shown conclusively to be without merit so as to obviate the
need for an evidentiary hearing."  *Id.*, at 286.

C

Respondent next filed a petition for a writ of habeas corpus
in the United States District Court for the Southern District
of Florida.   He advanced numerous grounds for relief,
among them ineffective assistance of counsel based on the
same errors, except for the failure to move for a continuance,
as those he had identified in state court.   The District Court
held an evidentiary hearing to inquire into trial counsel's ef-
forts to investigate and to present mitigating circumstances.
Respondent offered the affidavits and reports he had submit-
ted in the state collateral proceedings; he also called his trial
counsel to testify.   The State of Florida, over respondent's
objection, called the trial judge to testify.

The District Court disputed none of the state court factual
findings concerning trial counsel's assistance and made find-
ings of its own that are consistent with the state court find-
ings.   The account of trial counsel's actions and decisions
given above reflects the combined findings.   On the legal
issue of ineffectiveness, the District Court concluded that,
although trial counsel made errors in judgment in failing to

investigate nonstatutory mitigating evidence further than he did, no prejudice to respondent's sentence resulted from any such error in judgment.   Relying in part on the trial judge's testimony but also on the same factors that led the state courts to find no prejudice, the District Court concluded that "there does not appear to be a likelihood, or even a significant possibility," that any errors of trial counsel had affected the outcome of the sentencing proceeding.   App. to Pet. for Cert. A285–A286.   The District Court went on to reject all of respondent's other grounds for relief, including one not exhausted in state court, which the District Court considered because, among other reasons, the State urged its consideration.   *Id.*, at A286–A292.   The court accordingly denied the petition for a writ of habeas corpus.

On appeal, a panel of the United States Court of Appeals for the Fifth Circuit affirmed in part, vacated in part, and remanded with instructions to apply to the particular facts the framework for analyzing ineffectiveness claims that it developed in its opinion.   673 F. 2d 879 (1982).   The panel decision was itself vacated when Unit B of the former Fifth Circuit, now the Eleventh Circuit, decided to rehear the case en banc.   679 F. 2d 23 (1982).   The full Court of Appeals developed its own framework for analyzing ineffective assistance claims and reversed the judgment of the District Court and remanded the case for new factfinding under the newly announced standards.   693 F. 2d 1243 (1982).

The court noted at the outset that, because respondent had raised an unexhausted claim at his evidentiary hearing in the District Court, the habeas petition might be characterized as a mixed petition subject to the rule of *Rose* v. *Lundy*, 455 U. S. 509 (1982), requiring dismissal of the entire petition. The court held, however, that the exhaustion requirement is "a matter of comity rather than a matter of jurisdiction" and hence admitted of exceptions.   The court agreed with the District Court that this case came within an exception to the mixed petition rule.   693 F. 2d, at 1248, n. 7.

Turning to the merits, the Court of Appeals stated that the Sixth Amendment right to assistance of counsel accorded criminal defendants a right to "counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances." *Id.*, at 1250. The court remarked in passing that no special standard applies in capital cases such as the one before it: the punishment that a defendant faces is merely one of the circumstances to be considered in determining whether counsel was reasonably effective. *Id.*, at 1250, n. 12. The court then addressed respondent's contention that his trial counsel's assistance was not reasonably effective because counsel breached his duty to investigate nonstatutory mitigating circumstances.

The court agreed that the Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options. The court observed that counsel's investigatory decisions must be assessed in light of the information known at the time of the decisions, not in hindsight, and that "[t]he amount of pretrial investigation that is reasonable defies precise measurement." *Id.*, at 1251. Nevertheless, putting guilty-plea cases to one side, the court attempted to classify cases presenting issues concerning the scope of the duty to investigate before proceeding to trial.

If there is only one plausible line of defense, the court concluded, counsel must conduct a "reasonably substantial investigation" into that line of defense, since there can be no strategic choice that renders such an investigation unnecessary. *Id.*, at 1252. The same duty exists if counsel relies at trial on only one line of defense, although others are available. In either case, the investigation need not be exhaustive. It must include "'an independent examination of the facts, circumstances, pleadings and laws involved.'" *Id.*, at 1253 (quoting *Rummel v. Estelle*, 590 F. 2d 103, 104 (CA5 1979)). The scope of the duty, however, depends

on such facts as the strength of the government's case and
the likelihood that pursuing certain leads may prove more
harmful than helpful.   693 F. 2d, at 1253, n. 16.

If there is more than one plausible line of defense, the court
held, counsel should ideally investigate each line substan-
tially before making a strategic choice about which lines to
rely on at trial.   If counsel conducts such substantial investi-
gations, the strategic choices made as a result "will seldom
if ever" be found wanting.   Because advocacy is an art and
not a science, and because the adversary system requires
deference to counsel's informed decisions, strategic choices
must be respected in these circumstances if they are based
on professional judgment.  *Id.*, at 1254.

If counsel does not conduct a substantial investigation into
each of several plausible lines of defense, assistance may
nonetheless be effective.   Counsel may not exclude certain
lines of defense for other than strategic reasons.  *Id.*, at
1257–1258.   Limitations of time and money, however, may
force early strategic choices, often based solely on conversa-
tions with the defendant and a review of the prosecution's
evidence.   Those strategic choices about which lines of de-
fense to pursue are owed deference commensurate with the
reasonableness of the professional judgments on which they
are based.   Thus, "when counsel's assumptions are reasonable
given the totality of the circumstances and when counsel's
strategy represents a reasonable choice based upon those as-
sumptions, counsel need not investigate lines of defense that
he has chosen not to employ at trial."  *Id.*, at 1255 (footnote
omitted).   Among the factors relevant to deciding whether
particular strategic choices are reasonable are the experience
of the attorney, the inconsistency of unpursued and pursued
lines of defense, and the potential for prejudice from taking
an unpursued line of defense.  *Id.*, at 1256–1257, n. 23.

Having outlined the standards for judging whether defense
counsel fulfilled the duty to investigate, the Court of Appeals
turned its attention to the question of the prejudice to the

defense that must be shown before counsel's errors justify reversal of the judgment.   The court observed that only in cases of outright denial of counsel, of affirmative government interference in the representation process, or of inherently prejudicial conflicts of interest had this Court said that no special showing of prejudice need be made.   *Id.*, at 1258–1259.   For cases of deficient performance by counsel, where the government is not directly responsible for the deficiencies and where evidence of deficiency may be more accessible to the defendant than to the prosecution, the defendant must show that counsel's errors "resulted in actual and substantial disadvantage to the course of his defense."   *Id.*, at 1262. This standard, the Court of Appeals reasoned, is compatible with the "cause and prejudice" standard for overcoming procedural defaults in federal collateral proceedings and discourages insubstantial claims by requiring more than a showing, which could virtually always be made, of some conceivable adverse effect on the defense from counsel's errors. The specified showing of prejudice would result in reversal of the judgment, the court concluded, unless the prosecution showed that the constitutionally deficient performance was, in light of all the evidence, harmless beyond a reasonable doubt.   *Id.*, at 1260–1262.

   The Court of Appeals thus laid down the tests to be applied in the Eleventh Circuit in challenges to convictions on the ground of ineffectiveness of counsel.   Although some of the judges of the court proposed different approaches to judging ineffectiveness claims either generally or when raised in federal habeas petitions from state prisoners, *id.*, at 1264–1280 (opinion of Tjoflat, J.); *id.*, at 1280 (opinion of Clark, J.); *id.*, at 1285–1288 (opinion of Roney, J., joined by Fay and Hill, JJ.); *id.*, at 1288–1291 (opinion of Hill, J.), and although some believed that no remand was necessary in this case, *id.*, at 1281–1285 (opinion of Johnson, J., joined by Anderson, J.); *id.*, at 1285–1288 (opinion of Roney, J., joined by Fay and Hill, JJ.); *id.*, at 1288–1291 (opinion of Hill, J.), a majority

of the judges of the en banc court agreed that the case should
be remanded for application of the newly announced stand-
ards.   Summarily rejecting respondent's claims other than
ineffectiveness of counsel, the court accordingly reversed the
judgment of the District Court and remanded the case.   On
remand, the court finally ruled, the state trial judge's testi-
mony, though admissible "to the extent that it contains per-
sonal knowledge of historical facts or expert opinion," was
not to be considered admitted into evidence to explain the
judge's mental processes in reaching his sentencing decision.
*Id.*, at 1262–1263; see *Fayerweather* v. *Ritch*, 195 U. S. 276,
306–307 (1904).

D

Petitioners, who are officials of the State of Florida, filed a
petition for a writ of certiorari seeking review of the decision
of the Court of Appeals.   The petition presents a type of
Sixth Amendment claim that this Court has not previously
considered in any generality.   The Court has considered
Sixth Amendment claims based on actual or constructive de-
nial of the assistance of counsel altogether, as well as claims
based on state interference with the ability of counsel to ren-
der effective assistance to the accused.   *E. g., United States*
v. *Cronic, ante*, p. 648.   With the exception of *Cuyler* v.
*Sullivan*, 446 U. S. 335 (1980), however, which involved a
claim that counsel's assistance was rendered ineffective by
a conflict of interest, the Court has never directly and fully
addressed a claim of "actual ineffectiveness" of counsel's
assistance in a case going to trial.   Cf. *United States* v.
*Agurs*, 427 U. S. 97, 102, n. 5 (1976).

In assessing attorney performance, all the Federal Courts of
Appeals and all but a few state courts have now adopted the
"reasonably effective assistance" standard in one formulation
or another.   See *Trapnell* v. *United States*, 725 F. 2d 149,
151–152 (CA2 1983); App. B to Brief for United States in *United
States* v. *Cronic*, O. T. 1983, No. 82–660, pp. 3a–6a; Sarno,

Modern Status of Rules and Standards in State Courts as to
Adequacy of Defense Counsel's Representation of Criminal
Client, 2 A. L. R. 4th 99–157, §§ 7–10 (1980).   Yet this Court
has not had occasion squarely to decide whether that is the
proper standard.   With respect to the prejudice that a de-
fendant must show from deficient attorney performance, the
lower courts have adopted tests that purport to differ in more
than formulation.   See App. C to Brief for United States in
*United States* v. *Cronic*, *supra*, at 7a–10a; Sarno, *supra*, at
83–99, § 6.   In particular, the Court of Appeals in this case
expressly rejected the prejudice standard articulated by
Judge Leventhal in his plurality opinion in *United States* v.
*Decoster*, 199 U. S. App. D. C. 359, 371, 374–375, 624 F. 2d
196, 208, 211–212 (en banc), cert. denied, 444 U. S. 944
(1979), and adopted by the State of Florida in *Knight* v.
*State*, 394 So. 2d, at 1001, a standard that requires a show-
ing that specified deficient conduct of counsel was likely
to have affected the outcome of the proceeding.   693 F. 2d,
at 1261–1262.

For these reasons, we granted certiorari to consider the
standards by which to judge a contention that the Constitu-
tion requires that a criminal judgment be overturned because
of the actual ineffective assistance of counsel.   462 U. S.
1105 (1983).   We agree with the Court of Appeals that
the exhaustion rule requiring dismissal of mixed petitions,
though to be strictly enforced, is not jurisdictional.   See
*Rose* v. *Lundy*, 455 U. S., at 515–520.   We therefore ad-
dress the merits of the constitutional issue.

II

In a long line of cases that includes *Powell* v. *Alabama*, 287
U. S. 45 (1932), *Johnson* v. *Zerbst*, 304 U. S. 458 (1938), and
*Gideon* v. *Wainwright*, 372 U. S. 335 (1963), this Court has
recognized that the Sixth Amendment right to counsel exists,
and is needed, in order to protect the fundamental right to a
fair trial.   The Constitution guarantees a fair trial through

the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 275, 276 (1942); see *Powell* v. *Alabama, supra,* at 68–69.

Because of the vital importance of counsel's assistance, this Court has held that, with certain exceptions, a person accused of a federal or state crime has the right to have counsel appointed if retained counsel cannot be obtained. See *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972); *Gideon* v. *Wainwright, supra; Johnson* v. *Zerbst, supra.* That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

Opinion of the Court                    466 U. S.

For that reason, the Court has recognized that "the right to counsel is the right to the effective assistance of counsel." *McMann* v. *Richardson*, 397 U. S. 759, 771, n. 14 (1970). Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. See, *e. g.*, *Geders* v. *United States*, 425 U. S. 80 (1976) (bar on attorney-client consultation during overnight recess); *Herring* v. *New York*, 422 U. S. 853 (1975) (bar on summation at bench trial); *Brooks* v. *Tennessee*, 406 U. S. 605, 612–613 (1972) (requirement that defendant be first defense witness); *Ferguson* v. *Georgia*, 365 U. S. 570, 593–596 (1961) (bar on direct examination of defendant).   Counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render "adequate legal assistance," *Cuyler* v. *Sullivan*, 446 U. S., at 344.   *Id.*, at 345–350 (actual conflict of interest adversely affecting lawyer's performance renders assistance ineffective).

The Court has not elaborated on the meaning of the constitutional requirement of effective assistance in the latter class of cases—that is, those presenting claims of "actual ineffectiveness."   In giving meaning to the requirement, however, we must take its purpose—to ensure a fair trial—as the guide.   The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

The same principle applies to a capital sentencing proceeding such as that provided by Florida law.   We need not consider the role of counsel in an ordinary sentencing, which may involve informal proceedings and standardless discretion in the sentencer, and hence may require a different approach to the definition of constitutionally effective assistance.   A capital sentencing proceeding like the one involved in this case, however, is sufficiently like a trial in its adversarial format and in the existence of standards for decision, see *Barclay*

v. *Florida*, 463 U. S. 939, 952–954 (1983); *Bullington* v. *Missouri*, 451 U. S. 430 (1981), that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision.   For purposes of describing counsel's duties, therefore, Florida's capital sentencing proceeding need not be distinguished from an ordinary trial.

### III

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First, the defendant must show that counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.   This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.   Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

### A

As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance.   See *Trapnell* v. *United States*, 725 F. 2d, at 151–152.   The Court indirectly recognized as much when it stated in *McMann* v. *Richardson, supra*, at 770, 771, that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not "a reasonably competent attorney" and the advice was not "within the range of competence demanded of attorneys in criminal cases."   See also *Cuyler* v. *Sullivan, supra*, at 344.   When a convicted de-

fendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

More specific guidelines are not appropriate.  The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance.  It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See *Michel* v. *Louisiana*, 350 U. S. 91, 100–101 (1955).  The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

Representation of a criminal defendant entails certain basic duties.  Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest.  See *Cuyler* v. *Sullivan, supra,* at 346.  From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.  Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.  See *Powell* v. *Alabama*, 287 U. S., at 68–69.

These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance.  In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.  Prevailing norms of practice as reflected in American Bar Association standards and the like, *e. g.*, ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides.  No particular set of detailed rules for counsel's conduct can satisfactorily take

account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See *United States* v. *Decoster,* 199 U. S. App. D. C., at 371, 624 F. 2d, at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle* v. *Isaac,* 456 U. S. 107, 133–134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel* v. *Louisiana, supra,* at 101. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster,

The Trial for Life: Effective Assistance of Counsel in Death
Penalty Cases, 58 N. Y. U. L. Rev. 299, 343 (1983).

The availability of intrusive post-trial inquiry into attorney
performance or of detailed guidelines for its evaluation would
encourage the proliferation of ineffectiveness challenges.
Criminal trials resolved unfavorably to the defendant would
increasingly come to be followed by a second trial, this one of
counsel's unsuccessful defense.  Counsel's performance and
even willingness to serve could be adversely affected.  In-
tensive scrutiny of counsel and rigid requirements for accept-
able assistance could dampen the ardor and impair the inde-
pendence of defense counsel, discourage the acceptance of
assigned cases, and undermine the trust between attorney
and client.

Thus, a court deciding an actual ineffectiveness claim must
judge the reasonableness of counsel's challenged conduct on
the facts of the particular case, viewed as of the time of coun-
sel's conduct.  A convicted defendant making a claim of in-
effective assistance must identify the acts or omissions of
counsel that are alleged not to have been the result of reason-
able professional judgment.  The court must then determine
whether, in light of all the circumstances, the identified acts
or omissions were outside the wide range of professionally
competent assistance.  In making that determination, the
court should keep in mind that counsel's function, as elabo-
rated in prevailing professional norms, is to make the adver-
sarial testing process work in the particular case.  At the
same time, the court should recognize that counsel is strongly
presumed to have rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional
judgment.

These standards require no special amplification in order to
define counsel's duty to investigate, the duty at issue in this
case.  As the Court of Appeals concluded, strategic choices
made after thorough investigation of law and facts relevant
to plausible options are virtually unchallengeable; and strate-

gic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. See *United States* v. *Decoster, supra,* at 372–373, 624 F. 2d, at 209–210.

B

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. *United States* v. *Morrison,* 449 U. S. 361, 364–365 (1981). The purpose of the Sixth Amendment guarantee of counsel is to en-

sure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. See *United States* v. *Cronic, ante,* at 659, and n. 25. Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. *Ante,* at 658. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler* v. *Sullivan,* 446 U. S., at 345–350, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, *e. g.,* Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler* v. *Sullivan, supra,* at 350, 348 (footnote omitted).

Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. The government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence. Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, cf. *United States* v. *Valenzuela-Bernal*, 458 U. S. 858, 866–867 (1982), and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. Respondent suggests requiring a showing that the errors "impaired the presentation of the defense." Brief for Respondent 58. That standard, however, provides no workable principle. Since any error, if it is indeed an error, "impairs" the presentation of the defense, the proposed standard is inadequate because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding.

On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceed-

ings.  Moreover, it comports with the widely used standard
for assessing motions for new trial based on newly discovered
evidence.  See Brief for United States as *Amicus Curiae*
19–20, and nn. 10, 11.  Nevertheless, the standard is not
quite appropriate.

Even when the specified attorney error results in the omis-
sion of certain evidence, the newly discovered evidence
standard is not an apt source from which to draw a prejudice
standard for ineffectiveness claims.  The high standard for
newly discovered evidence claims presupposes that all the
essential elements of a presumptively accurate and fair pro-
ceeding were present in the proceeding whose result is chal-
lenged.  Cf. *United States* v. *Johnson*, 327 U. S. 106, 112
(1946).  An ineffective assistance claim asserts the absence
of one of the crucial assurances that the result of the proceed-
ing is reliable, so finality concerns are somewhat weaker and
the appropriate standard of prejudice should be somewhat
lower.  The result of a proceeding can be rendered unreli-
able, and hence the proceeding itself unfair, even if the errors
of counsel cannot be shown by a preponderance of the evi-
dence to have determined the outcome.

Accordingly, the appropriate test for prejudice finds its
roots in the test for materiality of exculpatory information
not disclosed to the defense by the prosecution, *United States*
v. *Agurs*, 427 U. S., at 104, 112–113, and in the test for ma-
teriality of testimony made unavailable to the defense by
Government deportation of a witness, *United States* v.
*Valenzuela-Bernal, supra,* at 872–874.  The defendant must
show that there is a reasonable probability that, but for coun-
sel's unprofessional errors, the result of the proceeding would
have been different.  A reasonable probability is a probabil-
ity sufficient to undermine confidence in the outcome.

In making the determination whether the specified errors
resulted in the required prejudice, a court should presume,
absent challenge to the judgment on grounds of evidentiary
insufficiency, that the judge or jury acted according to law.

An assessment of the likelihood of a result more favorable to
the defendant must exclude the possibility of arbitrariness,
whimsy, caprice, "nullification," and the like.   A defendant
has no entitlement to the luck of a lawless decisionmaker,
even if a lawless decision cannot be reviewed.   The assess-
ment of prejudice should proceed on the assumption that the
decisionmaker is reasonably, conscientiously, and impartially
applying the standards that govern the decision.   It should
not depend on the idiosyncracies of the particular decision-
maker, such as unusual propensities toward harshness or le-
niency.   Although these factors may actually have entered
into counsel's selection of strategies and, to that limited ex-
tent, may thus affect the performance inquiry, they are
irrelevant to the prejudice inquiry.   Thus, evidence about
the actual process of decision, if not part of the record of the
proceeding under review, and evidence about, for example, a
particular judge's sentencing practices, should not be consid-
ered in the prejudice determination.

   The governing legal standard plays a critical role in defin-
ing the question to be asked in assessing the prejudice from
counsel's errors.   When a defendant challenges a conviction,
the question is whether there is a reasonable probability
that, absent the errors, the factfinder would have had a
reasonable doubt respecting guilt.   When a defendant chal-
lenges a death sentence such as the one at issue in this case,
the question is whether there is a reasonable probability
that, absent the errors, the sentencer—including an appel-
late court, to the extent it independently reweighs the evi-
dence—would have concluded that the balance of aggravating
and mitigating circumstances did not warrant death.

   In making this determination, a court hearing an ineffec-
tiveness claim must consider the totality of the evidence be-
fore the judge or jury.   Some of the factual findings will have
been unaffected by the errors, and factual findings that were
affected will have been affected in different ways.   Some
errors will have had a pervasive effect on the inferences to

be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.   Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

### IV

A number of practical considerations are important for the application of the standards we have outlined.   Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules.   Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.   In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

To the extent that this has already been the guiding inquiry in the lower courts, the standards articulated today do not require reconsideration of ineffectiveness claims rejected under different standards.   Cf. *Trapnell* v. *United States*, 725 F. 2d, at 153 (in several years of applying "farce and mockery" standard along with "reasonable competence" standard, court "never found that the result of a case hinged on the choice of a particular standard").   In particular, the minor differences in the lower courts' precise formulations of the performance standard are insignificant: the different

STRICKLAND v. WASHINGTON 697

formulations are mere variations of the overarching reason-
ableness standard.   With regard to the prejudice inquiry,
only the strict outcome-determinative test, among the stand-
ards articulated in the lower courts, imposes a heavier bur-
den on defendants than the tests laid down today.   The dif-
ference, however, should alter the merit of an ineffectiveness
claim only in the rarest case.

Although we have discussed the performance component of
an ineffectiveness claim prior to the prejudice component,
there is no reason for a court deciding an ineffective assist-
ance claim to approach the inquiry in the same order or even
to address both components of the inquiry if the defendant
makes an insufficient showing on one.   In particular, a court
need not determine whether counsel's performance was defi-
cient before examining the prejudice suffered by the defend-
ant as a result of the alleged deficiencies.   The object of an
ineffectiveness claim is not to grade counsel's performance.
If it is easier to dispose of an ineffectiveness claim on the
ground of lack of sufficient prejudice, which we expect will
often be so, that course should be followed.   Courts should
strive to ensure that ineffectiveness claims not become so
burdensome to defense counsel that the entire criminal jus-
tice system suffers as a result.

The principles governing ineffectiveness claims should
apply in federal collateral proceedings as they do on direct
appeal or in motions for a new trial.   As indicated by the
"cause and prejudice" test for overcoming procedural waivers
of claims of error, the presumption that a criminal judgment
is final is at its strongest in collateral attacks on that judg-
ment.   See *United States* v. *Frady*, 456 U. S. 152, 162–169
(1982); *Engle* v. *Isaac*, 456 U. S. 107, 126–129 (1982).   An
ineffectiveness claim, however, as our articulation of the
standards that govern decision of such claims makes clear,
is an attack on the fundamental fairness of the proceeding
whose result is challenged.   Since fundamental fairness is
the central concern of the writ of habeas corpus, see *id.*,

at 126, no special standards ought to apply to ineffectiveness claims made in habeas proceedings.

Finally, in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U. S. C. § 2254(d).   Ineffectiveness is not a question of "basic, primary, or historical fac[t]," *Townsend* v. *Sain*, 372 U. S. 293, 309, n. 6 (1963).  Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact.   See *Cuyler* v. *Sullivan*, 446 U. S., at 342.   Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), and although district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.

### V

Having articulated general standards for judging ineffectiveness claims, we think it useful to apply those standards to the facts of this case in order to illustrate the meaning of the general principles.   The record makes it possible to do so.   There are no conflicts between the state and federal courts over findings of fact, and the principles we have articulated are sufficiently close to the principles applied both in the Florida courts and in the District Court that it is clear that the factfinding was not affected by erroneous legal principles.  See *Pullman-Standard* v. *Swint*, 456 U. S. 273, 291–292 (1982).

Application of the governing principles is not difficult in this case.   The facts as described above, see *supra*, at 671–678, make clear that the conduct of respondent's counsel at and before respondent's sentencing proceeding cannot be found unreasonable.   They also make clear that, even assuming the

challenged conduct of counsel was unreasonable, respondent suffered insufficient prejudice to warrant setting aside his death sentence.

With respect to the performance component, the record shows that respondent's counsel made a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes. Although counsel understandably felt hopeless about respondent's prospects, see App. 383–384, 400–401, nothing in the record indicates, as one possible reading of the District Court's opinion suggests, see App. to Pet. for Cert. A282, that counsel's sense of hopelessness distorted his professional judgment. Counsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable.

The trial judge's views on the importance of owning up to one's crimes were well known to counsel. The aggravating circumstances were utterly overwhelming. Trial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of little help. Respondent had already been able to mention at the plea colloquy the substance of what there was to know about his financial and emotional troubles. Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in. On these facts, there can be little question, even without application of the presumption of adequate performance, that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment.

With respect to the prejudice component, the lack of merit of respondent's claim is even more stark. The evidence that respondent says his trial counsel should have offered at the

sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge. As the state courts and District Court found, at most this evidence shows that numerous people who knew respondent thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed. Indeed, admission of the evidence respondent now offers might even have been harmful to his case: his "rap sheet" would probably have been admitted into evidence, and the psychological reports would have directly contradicted respondent's claim that the mitigating circumstance of extreme emotional disturbance applied to his case.

Our conclusions on both the prejudice and performance components of the ineffectiveness inquiry do not depend on the trial judge's testimony at the District Court hearing. We therefore need not consider the general admissibility of that testimony, although, as noted *supra*, at 695, that testimony is irrelevant to the prejudice inquiry. Moreover, the prejudice question is resolvable, and hence the ineffectiveness claim can be rejected, without regard to the evidence presented at the District Court hearing. The state courts properly concluded that the ineffectiveness claim was meritless without holding an evidentiary hearing.

Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. Here there is a double failure. More generally, respondent has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. Respondent's sentencing proceeding was not fundamentally unfair.

STRICKLAND *v.* WASHINGTON                701

668                    Opinion of BRENNAN, J.

We conclude, therefore, that the District Court properly declined to issue a writ of habeas corpus.   The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE BRENNAN, concurring in part and dissenting in part.

I join the Court's opinion but dissent from its judgment. Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, see *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting), I would vacate respondent's death sentence and remand the case for further proceedings.[1]

---

[1] The Court's judgment leaves standing another in an increasing number of capital sentences purportedly imposed in compliance with the procedural standards developed in cases beginning with *Gregg* v. *Georgia,* 428 U. S. 153 (1976).   Earlier this Term, I reiterated my view that these procedural requirements have proven unequal to the task of eliminating the irrationality that necessarily attends decisions by juries, trial judges, and appellate courts whether to take or spare human life.   *Pulley* v. *Harris,* 465 U. S. 37, 59 (1984) (BRENNAN, J., dissenting).   The inherent difficulty in imposing the ultimate sanction consistent with the rule of law, see *Furman* v. *Georgia,* 408 U. S. 238, 274–277 (1972) (BRENNAN, J., concurring); *McGautha* v. *California,* 402 U. S. 183, 248–312 (1971) (BRENNAN, J., dissenting), is confirmed by the extraordinary pressure put on our own deliberations in recent months by the growing number of applications to stay executions.   See *Wainwright* v. *Adams, post,* at 965 (MARSHALL, J., dissenting) (stating that "haste and confusion surrounding . . . decision [to vacate stay] is degrading to our role as judges"); *Autry* v. *McKaskle,* 465 U. S. 1085 (1984) (MARSHALL, J., dissenting) (criticizing Court for "dramatically expediting its normal deliberative processes to clear the way for an impending execution"); *Stephens* v. *Kemp,* 464 U. S. 1027, 1032 (1983) (POWELL, J., dissenting) (contending that procedures by which stay applications are considered "undermines public confidence in the courts and in the laws we are required to follow"); *Sullivan* v. *Wainwright,* 464 U. S. 109, 112 (1983) (BURGER, C. J., concurring) (accusing lawyers seeking review of their client's death sentences of turning "the

I

This case and *United States* v. *Cronic, ante,* p. 648, present our first occasions to elaborate the appropriate standards for judging claims of ineffective assistance of counsel.   In *Cronic,* the Court considers such claims in the context of cases "in which the surrounding circumstances [make] it so unlikely that any lawyer could provide effective assistance that ineffectiveness [is] properly presumed without inquiry into actual performance at trial," *ante,* at 661.   This case, in contrast, concerns claims of ineffective assistance based on allegations of specific errors by counsel— claims which, by their very nature, require courts to evaluate both the attorney's performance and the effect of that performance on the reliability and fairness of the proceeding. Accordingly, a defendant making a claim of this kind must show not only that his lawyer's performance was inadequate but also that he was prejudiced thereby.   See also *Cronic, ante,* at 659, n. 26.

I join the Court's opinion because I believe that the standards it sets out today will both provide helpful guidance to courts considering claims of actual ineffectiveness of counsel and also permit those courts to continue their efforts to achieve progressive development of this area of the law.   Like all federal courts and most state courts that have previously addressed the matter, see *ante,* at 683–684, the Court concludes that "the proper standard for attorney performance is that of reasonably effective assistance."   *Ante,* at 687.   And,

administration of justice into [a] sporting contest"); *Autry* v. *Estelle,* 464 U. S. 1, 6 (1983) (STEVENS, J., dissenting) (suggesting that Court's practice in reviewing applications in death cases "injects uncertainty and disparity into the review procedure, adds to the burdens of counsel, distorts the deliberative process within this Court, and increases the risk of error").   It is difficult to believe that the decision whether to put an individual to death generates any less emotional pressure among juries, trial judges, and appellate courts than it does among Members of this Court.

STRICKLAND *v.* WASHINGTON          703

668          Opinion of BRENNAN, J.

rejecting the strict "outcome-determinative" test employed
by some courts, the Court adopts as the appropriate stand-
ard for prejudice a requirement that the defendant "show
that there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would
have been different," defining a "reasonable probability"
as "a probability sufficient to undermine confidence in the
outcome." *Ante*, at 694. I believe these standards are
sufficiently precise to permit meaningful distinctions between
those attorney derelictions that deprive defendants of their
constitutional rights and those that do not; at the same time,
the standards are sufficiently flexible to accommodate the
wide variety of situations giving rise to claims of this kind.

With respect to the performance standard, I agree with
the Court's conclusion that a "particular set of detailed rules
for counsel's conduct" would be inappropriate. *Ante*, at 688.
Precisely because the standard of "reasonably effective as-
sistance" adopted today requires that counsel's performance
be measured in light of the particular circumstances of the
case, I do not believe our decision "will stunt the develop-
ment of constitutional doctrine in this area," *post*, at 709
(MARSHALL, J., dissenting). Indeed, the Court's suggestion
that today's decision is largely consistent with the approach
taken by the lower courts, *ante*, at 696, simply indicates that
those courts may continue to develop governing principles on
a case-by-case basis in the common-law tradition, as they have
in the past. Similarly, the prejudice standard announced
today does not erect an insurmountable obstacle to meri-
torious claims, but rather simply requires courts carefully
to examine trial records in light of both the nature and seri-
ousness of counsel's errors and their effect in the particular
circumstances of the case. *Ante*, at 695.[2]

───────────

[2] Indeed, counsel's incompetence can be so serious that it rises to the
level of a constructive denial of counsel which can constitute constitutional
error without any showing of prejudice. See *Cronic, ante*, at 659–660;

II

Because of their flexibility and the requirement that they be considered in light of the particular circumstances of the case, the standards announced today can and should be applied with concern for the special considerations that must attend review of counsel's performance in a capital sentencing proceeding.   In contrast to a case in which a finding of ineffective assistance requires a new trial, a conclusion that counsel was ineffective with respect to only the penalty phase of a capital trial imposes on the State the far lesser burden of reconsideration of the sentence alone.   On the other hand, the consequences to the defendant of incompetent assistance at a capital sentencing could not, of course, be greater.   Recognizing the unique seriousness of such a proceeding, we have repeatedly emphasized that "'where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'"   *Zant* v. *Stephens*, 462 U. S. 862, 874 (1983) (quoting *Gregg* v. *Georgia*, 428 U. S., at 188–189 (opinion of Stewart, POWELL, and STEVENS, JJ.)).

For that reason, we have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding.   As JUSTICE MARSHALL emphasized last Term:

"This Court has always insisted that the need for procedural safeguards is particularly great where life is at stake.   Long before the Court established the right to counsel in all felony cases, *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), it recognized that right in capital cases, *Powell* v. *Alabama*, 287 U. S. 45, 71–72 (1932).   Time

*Javor* v. *United States*, 724 F. 2d 831, 834 (CA9 1984) ("Prejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all").

STRICKLAND *v.* WASHINGTON          705

and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case. See, *e. g.*, *Bullington* v. *Missouri*, 451 U. S. 430 (1981); *Beck* v. *Alabama*, 447 U. S. 625 (1980); *Green* v. *Georgia*, 442 U. S. 95 (1979) *(per curiam)*; *Lockett* v. *Ohio*, 438 U. S. 586 (1978); *Gardner* v. *Florida*, 430 U. S. 349 (1977); *Woodson* v. *North Carolina*, 428 U. S. 280 (1976). . . .

"Because of th[e] basic difference between the death penalty and all other punishments, this Court has consistently recognized that there is 'a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' *Ibid.*" *Barefoot* v. *Estelle*, 463 U. S. 880, 913–914 (1983) (dissenting opinion).

See also *id.*, at 924 (BLACKMUN, J., dissenting). In short, this Court has taken special care to minimize the possibility that death sentences are "imposed out of whim, passion, prejudice, or mistake." *Eddings* v. *Oklahoma*, 455 U. S. 104, 118 (1982) (O'CONNOR, J., concurring).

In the sentencing phase of a capital case, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek* v. *Texas*, 428 U. S. 262, 276 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). For that reason, we have repeatedly insisted that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Eddings* v. *Oklahoma*, 455 U. S., at 112. In fact, as JUSTICE O'CONNOR has noted, a sentencing judge's failure to consider relevant aspects of a defendant's character and background creates such an unacceptable risk that the death penalty was unconstitutionally imposed that, even in cases where the matter was not raised below, the "interests of justice" may impose on reviewing courts "a duty to remand [the] case for resentencing." *Id.*, at 117, n., and 119 (O'CONNOR, J., concurring).

Of course, "[t]he right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence or fails to present a case in mitigation at the capital sentencing hearing." Comment, 83 Colum. L. Rev. 1544, 1549 (1983). See, e. g., *Burger* v. *Zant*, 718 F. 2d 979 (CA11 1983) (defendant, 17 years old at time of crime, sentenced to death after counsel failed to present any evidence in mitigation), stay granted, *post*, at 902. Accordingly, counsel's general duty to investigate, *ante*, at 690, takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.

That the Court rejects the ineffective-assistance claim in this case should not, of course, be understood to reflect any diminution in commitment to the principle that "'the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.'" *Eddings* v. *Oklahoma*, *supra*, at 112 (quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.)). I am satisfied that the standards announced today will go far towards assisting lower federal courts and state courts in discharging their constitutional duty to ensure that every criminal defendant receives the effective assistance of counsel guaranteed by the Sixth Amendment.

JUSTICE MARSHALL, dissenting.

The Sixth and Fourteenth Amendments guarantee a person accused of a crime the right to the aid of a lawyer in preparing and presenting his defense. It has long been settled that "the right to counsel is the right to the effective assist-

668                    MARSHALL, J., dissenting

ance of counsel." *McMann* v. *Richardson*, 397 U. S. 759, 771, n. 14 (1970).   The state and lower federal courts have developed standards for distinguishing effective from inadequate assistance.[1]   Today, for the first time, this Court attempts to synthesize and clarify those standards.   For the most part, the majority's efforts are unhelpful.   Neither of its two principal holdings seems to me likely to improve the adjudication of Sixth Amendment claims.   And, in its zeal to survey comprehensively this field of doctrine, the majority makes many other generalizations and suggestions that I find unacceptable.   Most importantly, the majority fails to take adequate account of the fact that the locus of this case is a capital sentencing proceeding.   Accordingly, I join neither the Court's opinion nor its judgment.

I

The opinion of the Court revolves around two holdings. First, the majority ties the constitutional minima of attorney performance to a simple "standard of reasonableness." *Ante*, at 688.   Second, the majority holds that only an error of counsel that has sufficient impact on a trial to "undermine confidence in the outcome" is grounds for overturning a conviction.   *Ante*, at 694.   I disagree with both of these rulings.

A

My objection to the performance standard adopted by the Court is that it is so malleable that, in practice, it will either have no grip at all or will yield excessive variation in the manner in which the Sixth Amendment is interpreted and applied by different courts.   To tell lawyers and the lower courts that counsel for a criminal defendant must behave

--------

[1] See Note, Identifying and Remedying Ineffective Assistance of Criminal Defense Counsel: A New Look After *United States* v. *Decoster*, 93 Harv. L. Rev. 752, 756–758 (1980); Note, Effective Assistance of Counsel: The Sixth Amendment and the Fair Trial Guarantee, 50 U. Chi. L. Rev. 1380, 1386–1387, 1399–1401, 1408–1410 (1983).

"reasonably" and must act like "a reasonably competent attorney," *ante*, at 687, is to tell them almost nothing. In essence, the majority has instructed judges called upon to assess claims of ineffective assistance of counsel to advert to their own intuitions regarding what constitutes "professional" representation, and has discouraged them from trying to develop more detailed standards governing the performance of defense counsel. In my view, the Court has thereby not only abdicated its own responsiblity to interpret the Constitution, but also impaired the ability of the lower courts to exercise theirs.

The debilitating ambiguity of an "objective standard of reasonableness" in this context is illustrated by the majority's failure to address important issues concerning the quality of representation mandated by the Constitution. It is an unfortunate but undeniable fact that a person of means, by selecting a lawyer and paying him enough to ensure he prepares thoroughly, usually can obtain better representation than that available to an indigent defendant, who must rely on appointed counsel, who, in turn, has limited time and resources to devote to a given case. Is a "reasonably competent attorney" a reasonably competent adequately paid retained lawyer or a reasonably competent appointed attorney? It is also a fact that the quality of representation available to ordinary defendants in different parts of the country varies significantly. Should the standard of performance mandated by the Sixth Amendment vary by locale?[2] The majority offers no clues as to the proper responses to these questions.

The majority defends its refusal to adopt more specific standards primarily on the ground that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take ac-

---

[2] Cf., *e. g.*, *Moore* v. *United States*, 432 F. 2d 730, 736 (CA3 1970) (defining the constitutionally required level of performance as "the exercise of the customary skill and knowledge which normally prevails at the time and place").

668          MARSHALL, J., dissenting

count of the variety of circumstances faced by defense coun-
sel or the range of legitimate decisions regarding how best to
represent a criminal defendant." *Ante,* at 688–689. I agree
that counsel must be afforded "wide latitude" when making
"tactical decisions" regarding trial strategy, see *ante,* at 689;
cf. *infra,* at 712, 713, but many aspects of the job of a criminal
defense attorney are more amenable to judicial oversight.
For example, much of the work involved in preparing for a
trial, applying for bail, conferring with one's client, making
timely objections to significant, arguably erroneous rulings of
the trial judge, and filing a notice of appeal if there are color-
able grounds therefor could profitably be made the subject of
uniform standards.

The opinion of the Court of Appeals in this case represents
one sound attempt to develop particularized standards de-
signed to ensure that all defendants receive effective legal
assistance. See 693 F. 2d 1243, 1251–1258 (CA5 1982) (en
banc). For other, generally consistent efforts, see *United
States* v. *Decoster,* 159 U. S. App. D. C. 326, 333–334, 487
F. 2d 1197, 1203–1204 (1973), disapproved on rehearing, 199
U. S. App. D. C. 359, 624 F. 2d 196 (en banc), cert. denied,
444 U. S. 944 (1979); *Coles* v. *Peyton,* 389 F. 2d 224, 226
(CA4), cert. denied, 393 U. S. 849 (1968); *People* v. *Pope,* 23
Cal. 3d 412, 424–425, 590 P. 2d 859, 866 (1979); *State* v.
*Harper,* 57 Wis. 2d 543, 550–557, 205 N. W. 2d 1, 6–9 (1973).[3]
By refusing to address the merits of these proposals, and
indeed suggesting that no such effort is worthwhile, the
opinion of the Court, I fear, will stunt the development of
constitutional doctrine in this area.

----

[3] For a review of other decisions attempting to develop guidelines for
assessment of ineffective-assistance-of-counsel claims, see Erickson,
Standards of Competency for Defense Counsel in a Criminal Case, 17 Am.
Crim. L. Rev. 233, 242–248 (1979). Many of these decisions rely heavily
on the standards developed by the American Bar Association. See ABA
Standards for Criminal Justice 4–1.1—4–8.6 (2d ed. 1980).

MARSHALL, J., dissenting                    466 U. S.

B

I object to the prejudice standard adopted by the Court for two independent reasons. First, it is often very difficult to tell whether a defendant convicted after a trial in which he was ineffectively represented would have fared better if his lawyer had been competent. Seemingly impregnable cases can sometimes be dismantled by good defense counsel. On the basis of a cold record, it may be impossible for a reviewing court confidently to ascertain how the government's evidence and arguments would have stood up against rebuttal and cross-examination by a shrewd, well-prepared lawyer. The difficulties of estimating prejudice after the fact are exacerbated by the possibility that evidence of injury to the defendant may be missing from the record precisely because of the incompetence of defense counsel.[4] In view of all these impediments to a fair evaluation of the probability that the outcome of a trial was affected by ineffectiveness of counsel, it seems to me senseless to impose on a defendant whose lawyer has been shown to have been incompetent the burden of demonstrating prejudice.

---

[4] Cf. *United States* v. *Ellison*, 557 F. 2d 128, 131 (CA7 1977). In discussing the related problem of measuring injury caused by joint representation of conflicting interests, we observed:

"[T]he evil . . . is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation." *Holloway* v. *Arkansas*, 435 U. S. 475, 490–491 (1978) (emphasis in original).

When defense counsel fails to take certain actions, not because he is "compelled" to do so, but because he is incompetent, it is often equally difficult to ascertain the prejudice consequent upon his omissions.

Second and more fundamentally, the assumption on which the Court's holding rests is that the only purpose of the constitutional guarantee of effective assistance of counsel is to reduce the chance that innocent persons will be convicted. In my view, the guarantee also functions to ensure that convictions are obtained only through fundamentally fair procedures.[5]   The majority contends that the Sixth Amendment is not violated when a manifestly guilty defendant is convicted after a trial in which he was represented by a manifestly ineffective attorney.   I cannot agree.   Every defendant is entitled to a trial in which his interests are vigorously and conscientiously advocated by an able lawyer.   A proceeding in which the defendant does not receive meaningful assistance in meeting the forces of the State does not, in my opinion, constitute due process.

In *Chapman v. California*, 386 U. S. 18, 23 (1967), we acknowledged that certain constitutional rights are "so basic to a fair trial that their infraction can never be treated as harmless error."   Among these rights is the right to the assistance of counsel at trial.   *Id.*, at 23, n. 8; see *Gideon v. Wainwright*, 372 U. S. 335 (1963).[6]   In my view, the right

---

[5] See *United States v. Decoster*, 199 U. S. App. D. C. 359, 454–457, 624 F. 2d 196, 291–294 (en banc) (Bazelon, J., dissenting), cert. denied, 444 U. S. 944 (1979); Note, 93 Harv. L. Rev., at 767–770.

[6] In cases in which the government acted in a way that prevented defense counsel from functioning effectively, we have refused to require the defendant, in order to obtain a new trial, to demonstrate that he was injured. In *Glasser v. United States*, 315 U. S. 60, 75–76 (1942), for example, we held:

"To determine the precise degree of prejudice sustained by [a defendant] as a result of the court's appointment of [the same counsel for two codefendants with conflicting interests] is at once difficult and unnecessary.   The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

As the Court today acknowledges, *United States v. Cronic, ante,* at 662, n. 31, whether the government or counsel himself is to blame for the inadequacy of the legal assistance received by a defendant should make no difference in deciding whether the defendant must prove prejudice.

MARSHALL, J., dissenting            466 U. S.

to *effective* assistance of counsel is entailed by the right to counsel, and abridgment of the former is equivalent to abridgment of the latter.[7]  I would thus hold that a showing that the performance of a defendant's lawyer departed from constitutionally prescribed standards requires a new trial regardless of whether the defendant suffered demonstrable prejudice thereby.

## II

Even if I were inclined to join the majority's two central holdings, I could not abide the manner in which the majority elaborates upon its rulings.  Particularly regrettable are the majority's discussion of the "presumption" of reasonableness to be accorded lawyers' decisions and its attempt to prejudge the merits of claims previously rejected by lower courts using different legal standards.

## A

In defining the standard of attorney performance required by the Constitution, the majority appropriately notes that many problems confronting criminal defense attorneys admit of "a range of legitimate" responses.  *Ante*, at 689.  And the majority properly cautions courts, when reviewing a lawyer's selection amongst a set of options, to avoid the hubris of hindsight.  *Ibid.*  The majority goes on, however, to suggest that reviewing courts should "indulge a strong presumption that counsel's conduct" was constitutionally acceptable, *ibid.;* see *ante*, at 690, 696, and should "appl[y] a heavy measure of deference to counsel's judgments," *ante*, at 691.

I am not sure what these phrases mean, and I doubt that they will be self-explanatory to lower courts.  If they denote nothing more than that a defendant claiming he was denied effective assistance of counsel has the burden of proof, I

---

[7] See *United States* v. *Yelardy*, 567 F. 2d 863, 865, n. 1 (CA6), cert. denied, 439 U. S. 842 (1978); *Beasley* v. *United States*, 491 F. 2d 687, 696 (CA6 1974); *Commonwealth* v. *Badger*, 482 Pa. 240, 243–244, 393 A. 2d 642, 644 (1978).

STRICKLAND v. WASHINGTON                713

668                        MARSHALL, J., dissenting

would agree.  See *United States* v. *Cronic, ante,* at 658.
But the adjectives "strong" and "heavy" might be read as
imposing upon defendants an unusually weighty burden of
persuasion.  If that is the majority's intent, I must respect-
fully dissent.  The range of acceptable behavior defined by
"prevailing professional norms," *ante,* at 688, seems to me
sufficiently broad to allow defense counsel the flexibility they
need in responding to novel problems of trial strategy.  To
afford attorneys more latitude, by "strongly presuming" that
their behavior will fall within the zone of reasonableness, is
covertly to legitimate convictions and sentences obtained on
the basis of incompetent conduct by defense counsel.

The only justification the majority itself provides for its
proposed presumption is that undue receptivity to claims of
ineffective assistance of counsel would encourage too many
defendants to raise such claims and thereby would clog the
courts with frivolous suits and "dampen the ardor" of defense
counsel.  See *ante,* at 690.  I have more confidence than the
majority in the ability of state and federal courts expedi-
tiously to dispose of meritless arguments and to ensure that
responsible, innovative lawyering is not inhibited.  In my
view, little will be gained and much may be lost by instruct-
ing the lower courts to proceed on the assumption that a
defendant's challenge to his lawyer's performance will be
insubstantial.

B

For many years the lower courts have been debating the
meaning of "effective" assistance of counsel.  Different
courts have developed different standards.  On the issue of
the level of performance required by the Constitution, some
courts have adopted the forgiving "farce-and-mockery"
standard,[8] while others have adopted various versions of

---

[8]See, *e. g., State* v. *Pacheco,* 121 Ariz. 88, 91, 588 P. 2d 830, 833 (1978);
*Hoover* v. *State,* 270 Ark. 978, 980, 606 S. W. 2d 749, 751 (1980); *Line* v.
*State,* 272 Ind. 353, 354–355, 397 N. E. 2d 975, 976 (1979).

the "reasonable competence" standard.[9]   On the issue of
the level of prejudice necessary to compel a new trial, the
courts have taken a wide variety of positions, ranging from
the stringent "outcome-determinative" test,[10] to the rule that
a showing of incompetence on the part of defense counsel
automatically requires reversal of the conviction regardless
of the injury to the defendant.[11]

The Court today substantially resolves these disputes.
The majority holds that the Constitution is violated when de-
fense counsel's representation falls below the level expected
of reasonably competent defense counsel, *ante*, at 687–691,
and so affects the trial that there is a "reasonable probability"
that, absent counsel's error, the outcome would have been
different, *ante*, at 691–696.

Curiously, though, the Court discounts the significance of
its rulings, suggesting that its choice of standards matters
little and that few if any cases would have been decided
differently if the lower courts had always applied the tests
announced today.   See *ante*, at 696–697.   Surely the judges
in the state and lower federal courts will be surprised to learn
that the distinctions they have so fiercely debated for many
years are in fact unimportant.

The majority's comments on this point seem to be
prompted principally by a reluctance to acknowledge that to-
day's decision will require a reassessment of many previously
rejected ineffective-assistance-of-counsel claims.   The ma-
jority's unhappiness on this score is understandable, but its
efforts to mitigate the perceived problem will be ineffectual.
Nothing the majority says can relieve lower courts that hith-

_____

[9] See, *e. g.*, *Trapnell* v. *United States*, 725 F. 2d 149, 155 (CA2 1983);
*Cooper* v. *Fitzharris*, 586 F. 2d 1325, 1328–1330 (CA9 1978) (en banc), cert.
denied, 440 U. S. 974 (1979).

[10] See, *e. g.*, *United States* v. *Decoster*, 199 U. S. App. D. C., at 370, and
n. 74, 624 F. 2d, at 208, and n. 74 (plurality opinion); *Knight* v. *State*, 394
So. 2d 997, 1001 (Fla. 1981).

[11] See n. 7, *supra*.

erto have been using standards more tolerant of ineffectual advocacy of their obligation to scrutinize all claims, old as well as new, under the principles laid down today.

## III

The majority suggests that, "[f]or purposes of describing counsel's duties," a capital sentencing proceeding "need not be distinguished from an ordinary trial." *Ante,* at 687. I cannot agree.

The Court has repeatedly acknowledged that the Constitution requires stricter adherence to procedural safeguards in a capital case than in other cases.

> "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976) (plurality opinion) (footnote omitted).[12]

The performance of defense counsel is a crucial component of the system of protections designed to ensure that capital punishment is administered with some degree of rationality. "Reliability" in the imposition of the death sentence can be approximated only if the sentencer is fully informed of "all possible relevant information about the individual defendant whose fate it must determine." *Jurek* v. *Texas,* 428 U. S. 262, 276 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). The job of amassing that information and presenting it

_____

[12] See also *Zant* v. *Stephens,* 462 U. S. 862, 884–885 (1983); *Eddings* v. *Oklahoma,* 455 U. S. 104, 110–112 (1982); *Lockett* v. *Ohio,* 438 U. S. 586, 604 (1978) (plurality opinion).

MARSHALL, J., dissenting          466 U. S.

in an organized and persuasive manner to the sentencer is
entrusted principally to the defendant's lawyer.   The im-
portance to the process of counsel's efforts,[13] combined with
the severity and irrevocability of the sanction at stake, re-
quire that the standards for determining what constitutes
"effective assistance" be applied especially stringently in
capital sentencing proceedings.[14]

It matters little whether strict scrutiny of a claim that
ineffectiveness of counsel resulted in a death sentence
is achieved through modification of the Sixth Amendment
standards or through especially careful application of those
standards.   JUSTICE BRENNAN suggests that the necessary
adjustment of the level of performance required of counsel in
capital sentencing proceedings can be effected simply by con-
struing the phrase, "reasonableness under prevailing profes-
sional norms," in a manner that takes into account the nature
of the impending penalty.   *Ante*, at 704–706.   Though I
would prefer a more specific iteration of counsel's duties in
this special context,[15] I can accept that proposal.   However,
when instructing lower courts regarding the probability of
impact upon the outcome that requires a resentencing, I think
the Court would do best explicitly to modify the legal stand-
ard itself.[16]   In my view, a person on death row, whose coun-
sel's performance fell below constitutionally acceptable levels,
should not be compelled to demonstrate a "reasonable prob-

---

[13] See Goodpaster, The Trial for Life: Effective Assistance of Counsel in
Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 303 (1983).

[14] As JUSTICE BRENNAN points out, *ante*, at 704, an additional reason
for examining especially carefully a Sixth Amendment challenge when it
pertains to a capital sentencing proceeding is that the result of finding a
constitutional violation in that context is less disruptive than a finding
that counsel was incompetent in the liability phase of a trial.

[15] See Part I–A, *supra*.   For a sensible effort to formulate guidelines
for the conduct of defense counsel in capital sentencing proceedings, see
Goodpaster, *supra*, at 343–345, 360–362.

[16] For the purposes of this and the succeeding section, I assume, solely
for the sake of argument, that some showing of prejudice is necessary to
state a violation of the Sixth Amendment.   But cf. Part I–B, *supra*.

STRICKLAND *v.* WASHINGTON                    717

668                     MARSHALL, J., dissenting

ability" that he would have been given a life sentence if his
lawyer had been competent, see *ante*, at 694; if the defendant
can establish a significant chance that the outcome would
have been different, he surely should be entitled to a redeter-
mination of his fate.   Cf. *United States* v. *Agurs*, 427 U. S.
97, 121–122 (1976) (MARSHALL, J., dissenting).[17]

IV

The views expressed in the preceding section oblige me to
dissent from the majority's disposition of the case before us.[18]
It is undisputed that respondent's trial counsel made virtu-
ally no investigation of the possibility of obtaining testimony
from respondent's relatives, friends, or former employers
pertaining to respondent's character or background.   Had
counsel done so, he would have found several persons willing
and able to testify that, in their experience, respondent was
a responsible, nonviolent man, devoted to his family, and
active in the affairs of his church.   See App. 338–365.   Re-
spondent contends that his lawyer could have and should
have used that testimony to "humanize" respondent, to coun-
teract the impression conveyed by the trial that he was little
more than a cold-blooded killer.   Had this evidence been
admitted, respondent argues, his chances of obtaining a life
sentence would have been significantly better.

_____

[17] As I read the opinion of the Court, it does not preclude this kind of
adjustment of the legal standard.   The majority defines "reasonable prob-
ability" as "a probability sufficient to undermine confidence in the out-
come."   *Ante*, at 694.   In view of the nature of the sanction at issue, and
the difficulty of determining how a sentencer would have responded if pre-
sented with a different set of facts, it could be argued that a lower estimate
of the likelihood that the outcome of a capital sentencing proceeding was
influenced by attorney error is sufficient to "undermine confidence" in that
outcome than would be true in an ordinary criminal case.

[18] Adhering to my view that the death penalty is unconstitutional under
all circumstances, *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976) (MARSHALL,
J., dissenting), I would vote to vacate respondent's sentence even if he had
not presented a substantial Sixth Amendment claim.

718 OCTOBER TERM, 1983

MARSHALL, J., dissenting                    466 U. S.

Measured against the standards outlined above, respondent's contentions are substantial. Experienced members of the death-penalty bar have long recognized the crucial importance of adducing evidence at a sentencing proceeding that establishes the defendant's social and familial connections. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 300–303, 334–335 (1983). The State makes a colorable—though in my view not compelling—argument that defense counsel in this case might have made a reasonable "strategic" decision not to present such evidence at the sentencing hearing on the assumption that an unadorned acknowledgment of respondent's responsibility for his crimes would be more likely to appeal to the trial judge, who was reputed to respect persons who accepted responsiblity for their actions.[19] But however justifiable such a choice might have been after counsel had fairly assessed the potential strength of the mitigating evidence available to him, counsel's failure to make any significant effort to find out what evidence might be garnered from respondent's relatives and acquaintances surely cannot be described as "reasonable." Counsel's failure to investigate is particularly suspicious in light of his candid admission that respondent's confessions and conduct in the course of the trial gave him a feeling of "hopelessness" regarding the possibility of saving respondent's life, see App. 383–384, 400–401.

---

[19] Two considerations undercut the State's explanation of counsel's decision. First, it is not apparent why adducement of evidence pertaining to respondent's character and familial connections would have been inconsistent with respondent's acknowledgment that he was responsible for his behavior. Second, the Florida Supreme Court possesses—and frequently exercises—the power to overturn death sentences it deems unwarranted by the facts of a case. See State v. Dixon, 283 So. 2d 1, 10 (1973). Even if counsel's decision not to try to humanize respondent for the benefit of the trial judge were deemed reasonable, counsel's failure to create a record for the benefit of the State Supreme Court might well be deemed unreasonable.

STRICKLAND *v.* WASHINGTON          719

668          MARSHALL, J., dissenting

That the aggravating circumstances implicated by respondent's criminal conduct were substantial, see *ante*, at 700, does not vitiate respondent's constitutional claim; judges and juries in cases involving behavior at least as egregious have shown mercy, particularly when afforded an opportunity to see other facets of the defendant's personality and life.[20]  Nor is respondent's contention defeated by the possibility that the material his counsel turned up might not have been sufficient to establish a statutory mitigating circumstance under Florida law; Florida sentencing judges and the Florida Supreme Court sometimes refuse to impose death sentences in cases "in which, even though *statutory* mitigating circumstances do not outweigh statutory aggravating circumstances, the addition of nonstatutory mitigating circumstances tips the scales in favor of life imprisonment." *Barclay* v. *Florida*, 463 U. S. 939, 964 (1983) (STEVENS, J., concurring in judgment) (emphasis in original).

If counsel had investigated the availability of mitigating evidence, he might well have decided to present some such material at the hearing.  If he had done so, there is a significant chance that respondent would have been given a life sentence.  In my view, those possibilities, conjoined with the unreasonableness of counsel's failure to investigate, are more than sufficient to establish a violation of the Sixth Amendment and to entitle respondent to a new sentencing proceeding.

I respectfully dissent.

---

[20] See, *e. g.*, Farmer & Kinard, The Trial of the Penalty Phase (1976), reprinted in 2 California State Public Defender, California Death Penalty Manual N–33, N–45 (1980).