# Exhibit G

Jones v. Aberdeen Proving Ground Federal Credit Union, et al. | Casetext Search + Citator

Read    How cited

**RODNEY T. JONES, Plaintiff,**

v.

**ABERDEEN PROVING GROUND FEDERAL CREDIT UNION, et al.,**
**Defendants.**

Civil Action No. ELH-21-1915.

**United States District Court, D. Maryland.**

April 5, 2022.

## MEMORANDUM OPINION

ELLEN L. HOLLANDER, District Judge.

In this debt dispute, plaintiff Rodney T. Jones filed suit against defendants Aberdeen Proving Ground Federal Credit Union ("APG"); Equifax Information Services, LLC ("Equifax"); and Experian Information Solutions, Inc. ("Experian"). ECF 1 (the "Complaint"). Jones alleges that APG continues to demand payment on a loan that he has paid in full, as reflected in a judgment. *Id.* And, he asserts that APG has falsely reported this purported debt to Equifax and Experian, which have failed to follow reasonable procedures to assure the maximum possible accuracy of their credit reports regarding plaintiff. *Id.*

Specifically, the Complaint contains seven counts; six pertain only to APG.[1] In Count I, plaintiff alleges violations of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code (2013 Repl. Vol., 2021 Supp.), § 14-201 *et seq.* of the Commercial Law Article ("C.L."). In particular, in Count I plaintiff claims that APG violated C.L. § 14-202(e) by knowingly disclosing or threatening to disclose information that affected plaintiff's reputation for credit worthiness; violated C.L. § 14-202(8) by attempting to maintain a lien on property when the lien did not exist; and violated C.L. § 14-202(11) by engaging in prohibited debt collection conduct. In Count II, plaintiff asserts violations of the Maryland Consumer Protection Act ("MCPA"), C.L. § 13-101 *et seq.* Count III alleges violations of the Fair Credit Reporting Act ("FCFA"), 15 U.S.C. § 1681 *et seq.* Count IV alleges defamation. In Count V, plaintiff asserts "Invasion of Privacy — Intrusion Upon Seclusion". Count VI seeks specific performance as to property. And, Count VII asserts violations of the FCRA by Equifax and Experian.

Equifax and Experian have answered the Complaint. ECF 17 (Experian); ECF 19 (Equifax); ECF 23 (Experian Amended Answer). But, APG has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Rule 56, prior to discovery. ECF 20. The motion is supported by a memorandum (ECF 20-1, collectively the "Motion") and several exhibits. ECF 20-2 to ECF 20-8.

Plaintiff opposes the Motion (ECF 22, the "Opposition"), supported by several exhibits. ECF 22-2 to ECF 22-7. In the Opposition and an accompanying Affidavit of plaintiff's counsel (ECF 22-7), plaintiff challenges conversion to summary judgment, pursuant to Fed. R. Civ. P. 56(d). ECF 22 at 5-6. APG has replied. ECF 27 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall construe the Motion as a motion to dismiss and deny the Motion.

142

Plaintiff is a resident of Harford County, Maryland. ECF 1 at 2, ¶ 8. In 2006, plaintiff took out a home equity line of credit or "second mortgage" (the "Loan") with APG. *See* ECF 20-3 (the "Note" for the Loan).[3]

In particular, plaintiff borrowed $81,900, to be paid back in monthly installments with interest at a yearly rate of 9.24%. ECF 20-3 at 1. The Note was secured by property located on Orchid Court in Edgewood, Maryland (the "Property"). ECF 1, ¶¶ 111-14. Plaintiff is in actual, peaceable possession of the Property, and plaintiff and his wife are title owners of the Property. *Id.* ¶¶ 109-110. APG claims a deed of trust on the Property, but plaintiff disputes APG's continued entitlement to it. *Id.* ¶¶ 114-16.

On October 30, 2017, APG initiated a debt collection action against plaintiff in the Circuit Court for Harford County, seeking to collect "what it alleged to be the whole amount owed on the second mortgage." *Id.* at 3, ¶ 1; *see also* ECF 20-4 (Docket for *Aberdeen Proving Ground Federal Credit Union v. Rodney T Jones,* Case No. 12-C-17-002882 (Harford Cty. Cir. Ct.)) at 2.[4] In March 2018, APG and Jones reached a "Stipulation of Settlement & Dismissal Under MD Rule 2-506(b)." ECF 20-5 (the "Stipulation"). The Stipulation was signed by Jones on March 5, 2018, and by APG's counsel on March 23, 2018. *See id.* at 3.

The "Recitals" to the Stipulation state, in part: "Plaintiff [meaning APG] and Defendant [meaning Jones] are presently parties to an action in this Honorable Court," and they "desire to settle this matter under the terms set forth below." *Id.* at 1. It also states, *id.*:

> WHEREAS, Defendant admits that [there is] an unpaid principal balance of $35,557.67, plus accumulated interest through February 12, 2018 of $477.35 plus pre-judgment interest from February 12, 2018 through the date of judgment at the contractual rate of 9.2400, plus attorney's fees of $5,336.00, and court costs. . . .

In addition, in the section titled "Terms," the Stipulation provides: "Upon the execution of this Stipulation, Plaintiff agrees to dismiss without prejudice the above captioned case pursuant to Maryland Rule 2-506(b)." *Id.* (underlining in original). For his part, Jones agreed to pay the amount described above "in full satisfaction of the claim provided Defendant [meaning Jones] complies with the provisions of this Stipulation." *Id.* This amount was to be paid in monthly installments of $900, due on the last day of each month, beginning January 30, 2018. *Id.* at 2. The Complaint implies, although it does not make explicit, that APG had asserted that Jones owed more than the $35,557 amount to which it agreed in the Stipulation.[5]

Moreover, the Stipulation provides: "In the event Defendant fails to make payment as described above, Defendant will be in default." *Id.* And, "[i]n the event of default, [Jones] consents to judgment in the full amount as indicated in the Recitals above, less credit for payment made." *Id.* In addition, the Stipulation indicated that it constituted the "entire understanding between the parties respecting the subject matter hereof," with "no representations, agreements or understandings, oral or written . . . relating to the subject matter . . . which are not fully set forth herein." *Id.*

According to the docket, the Stipulation was filed with the circuit court on March 26, 2018. ECF 20-4 at 3. And, a "Stipulated/Dismissed" notation was entered on that court's docket on March 29, 2018. *Id.* at 4.

However, in the State litigation on June 25, 2018, APG filed a "Motion to Reopen Case and for Consent Judgment." ECF 22-2 (the "2018 Motion"); *see* ECF 20-4 at 4. In the 2018 Motion, APG asserted that it had "attempted to resolve the matter" with Jones "by entering into" the Stipulation, and recited the amount described above that Jones had admitted was due and owing in the Stipulation. ECF 22-2 at 1. According to APG, Jones "failed to pay as agreed and is in breach and default thereof," and "never made a

payment following this agreement." *Id.* And, APG asserted: "Upon default, Defendant [including Jones] agreed to consent to judgment in the full amount as stated in the Recitals above, less payment for credits made." *Id.* Therefore, the 2018 Motion asked the circuit court to enter a "judgment by Stipulated Agreement" in favor of APG and against Jones for the principal sum of $34,367.99; accrued interest through June 18, 2018, of $147.90; pre-judgment interest from June 19, 2018, through judgment at a contract rate of 9.24%; and post judgment interest at the statutory rate per annum. *Id.* at 1-2; *see id.* at 3 (proposed order).[6]

Jones did not respond to the 2018 Motion. *See* ECF 20-4 at 4. And, by Order dated July 23, 2018, the circuit court granted the 2018 Motion, and entered a consent judgment against Jones for the amount requested by APG. ECF 20-6 at 2 (the "2018 Order"); *see also* ECF 1 at 3, ¶ 2; ECF 20-4 at 4. The next day, July 24, 2018, the Clerk of the Circuit Court docketed the Order, as well as a "Notice of Recorded Judgment," reflecting that judgment had been entered against Jones and in favor of APG for a total of $34,515.89. ECF 20-6; ECF 20-4 at 4. The docket provides the detail of an award in the principal amount of $34,367.99, "Plus accrued interest through June 18, 2018 of $147.90; Plus pre-judgment interest from June 19, 2018 through judgment at the contract rate of 9.24% ($8.7003 per day); Post Judgment interest at the statutory rate per annum." ECF 20-4 at 4.[7] APG characterizes the 2018 Order as "an interlocutory order." ECF 20-1 at 3.

Plaintiff alleges that, as of July 24, 2018, "the total amount due" on his Loan was the amount of the judgment, *i.e.,* $34,515.89, plus additional interest, "and no more." ECF 1 at 4, ¶ 4. And, he claims that, "[o]ver the following three years," he "paid in excess of $28,000.00 on the judgment." *Id.* at 4, ¶ 5.

In early 2021, plaintiff wanted to "pay off the judgment in its entirety. . . ." *Id.* at 4, ¶ 6. To that end, he contacted APG's attorneys to inquire as to the amount "left to pay." *Id.; see* ECF 22-5 (email chain between plaintiff and counsel for APG). Plaintiff first emailed counsel for APG on January 12, 2021, asking for a "payoff quote." ECF 22-5 at 7. On February 8, 2021, David Poch, an attorney representing APG, wrote to plaintiff: "We have confirmed with APG FCU and the current payoff for the HELOC is $40,772.93." ECF 22-5 at 3; *see* ECF 1 at 4, ¶ 7.[8] But, according to plaintiff, he was also told that only $12,563.25 remained on the judgment. ECF 1 at 4, ¶ 7.

Plaintiff responded to the lawyer, asserting that the larger sum was "completely inaccurate." ECF 22-5 at 2. He argued that he did not owe an amount that exceeded the sum reflected in the 2018 Order, and that based on his payments of more than $28,000 between July 31, 2018, and January 31, 2021, there should be less than $40,772.93 remaining to pay off the Loan. *Id.* at 2-3. In response, counsel for APG stated: "The settlement amount was for a judgment on the note. The amount did not reflect multiple NSF checks that were issued to the client [APG] which is why the payoff on the HELOC went up." *Id.* at 2.[9]

Notwithstanding this dispute, plaintiff then paid over $12,000 to satisfy "the judgment in full." ECF 1 at 4, ¶ 8. Thereafter, on March 2, 2021, APG filed a "Line of Satisfaction of Judgment" in the circuit court case. ECF 22-3 (the "Line of Satisfaction"); *see* ECF 1 at 4, ¶ 9; ECF 20-4 at 4. The Line of Satisfaction asked the Clerk of Court to "mark the judgment entered on 7/23/2018 [*i.e.* the 2018 Order] in the above-captioned case as paid in full and satisfied. Please release and dismiss any and all liens, levies, oral exams, and garnishments currently pending before the court." ECF 22-3. Plaintiff asserts in the suit that "by marking the judgment satisfied, APG acknowledged that Mr. Jones had paid everything he was obligated [to pay] under the judgment *and under the contract* which merged into the judgment." ECF 1 at 4-5, ¶ 10 (emphasis in original).[10]

Nevertheless, according to the Complaint, "APG continued to false [sic] report that Mr. Jones owed more money to the Credit Reporting Agencies ["CRAs"], and continued to demand that Mr. Jones pay it even more money." ECF 1 at 5, ¶ 11.[11] On March 16, 2021, APG called plaintiff, stating that he was late with his "March payment." *Id.* ¶ 29. APG called plaintiff "daily . . . to try to collect the debt" (*id.* ¶ 30) and called him "several

144

times" in total after he "paid off the account." *Id.* ¶ 96. APG also sent emails seeking to collect on the account. *Id.* ¶ 108.

On March 31, 2021, APG called plaintiff and "threatened" that if he did not pay, "APG would further damage [plaintiff's] credit by falsely reporting that [plaintiff] had missed a payment." *Id.* ¶ 31. At the time, plaintiff was in the process of obtaining a new mortgage loan in order to buy a new house. *Id.* ¶ 32. Plaintiff's loan officer for the new loan "told him that the APG account was affecting his rate on the new mortgage and that there might be further questions about it." *Id.* Because plaintiff believed that APG would report this "false information" and that this would increase the rate on his new mortgage, plaintiff "felt compelled to make the payment of $737 that APG demanded." *Id.* ¶ 34. But, he "paid under protest to protect his creditworthiness." *Id.* ¶ 35. The Complaint elsewhere asserts plaintiff "made payments to APG," even though he disputed that they were due, in order to "mitigate the damage APG's false reporting did to his creditworthiness." *Id.* ¶ 42.

According to plaintiff, APG told him to make the payment online via its member services system, and that they would not report him adversely if he paid in this way on March 31, 2021. ECF 1, ¶ 35. But, even though plaintiff did so, APG called him on April 1, 2021, to inform him that his March 31, 2021, payment did not clear and might take up to five days to clear, and that "they were going to report that he had missed a payment." *Id.* ¶ 36.

As for false reporting, the Complaint alleges that even before the Line of Satisfaction, APG "falsely reported" to the CRAs that plaintiff owed more money. *Id.* at 5, ¶ 12. For example, APG reported to Equifax and TransUnion that plaintiff "owed $40,682 to APG, with a scheduled payment of $736 and that the account was open and in collections." *Id.* And, APG reported to Experian that plaintiff "owed $50,356 to APG, that the recent payment amount was $2,200 and that the account was open." *Id.* Furthermore, after plaintiff "satisfied the judgment, APG failed to report that the account had been paid in full." *Id.* at 5, ¶ 13. The Complaint asserts: "APG knew that the judgment was not for $40,682 as of January, 2021, and knew that it was not for $50,356 as of January, 2021, and knew that in fact it had been satisfied as of March, 2021. . . . APG also knew that the judgment resolved all its claims against Mr. Jones in relation to the account. It therefore knew that the information it furnished was false." *Id.* ¶¶ 14-15.[12]

Plaintiff disputed this "false information" with Experian, Equifax, and TransUnion. *Id.* ¶ 16. Equifax received plaintiff's dispute on March 14, 2021; Experian received it on March 15, 2021; and TransUnion received it on March 18, 2021. *Id.* ¶¶ 17-19. "On information and belief," Experian and Equifax passed plaintiff's disputes along to APG "in accordance with their statutory duties." *Id.* ¶ 20. Experian responded to plaintiff's dispute on March 26, 2021, advising that APG had certified to Experian that the information was accurate. ECF 1, ¶ 21. "However," the Complaint asserts, "APG failed to update the account from its January 2019 status with Experian, despite many intervening payments, and the satisfaction of the judgment on the account." *Id.* ¶ 22.

Equifax responded the same day. *Id.* ¶ 24. Equifax changed its information to show a balance of $28,249, which plaintiff asserts "was still inaccurate." *Id.* Plaintiff alleges that, "on information and belief," Experian and Equifax "chose to blindly parrot APG's inaccurate response" rather than conduct their own reasonable investigations. *Id.* ¶¶ 23, 25.

Plaintiff's prospective mortgage lender for his new house, Lennar Mortgage, wanted to speak to APG regarding the issue. *Id.* ¶ 26. On April 16, 2021, plaintiff and his Lennar loan officer spoke with APG by telephone. *Id.* ¶ 27. According to the Complaint, "APG gave inconsistent explanations for the Experian reporting: that APG's attorneys had told it what information to furnish to the CRAs; that APG was obligated to report that the account was a collection account; then that the account was *not* a collection account and would be updated immediately." *Id.* (emphasis in original).

Jones alleges damages as a result of defendants' conduct. As noted, in order to protect his creditworthiness, plaintiff made payments to APG that he did not believe were owed.

145

*Id.* ¶ 42. And, since April 2019, plaintiff asserts that he "has been offered less favorable terms on credit on numerous occasions because agencies adverse credit reporting." *Id.* ¶ 38. In 2019, he sought to refinance his family's home, "in part to get rid of the APG account," but APG "did not cooperate." *Id.* In "late 2020," when plaintiff and his family wanted to move to a new house, as noted, he applied for preapproval for a mortgage from two lenders, Lennar Mortgage and Homespire Mortgage. *Id.* ¶¶ 40, 43–44. Loan officers from both companies told plaintiff that APG's reporting would, at the very least, raise his interest rate, potentially costing plaintiff "thousands of dollars." ECF 1, ¶ 40. Lennar Mortgage, plaintiff's preferred lender, ultimately denied plaintiff a mortgage because of the APG reporting, rendering him ineligible for "$15,000.00 in incentives that he would otherwise have received from the home builder." *Id.* ¶ 43. Homespire Mortgage agreed to provide plaintiff with a mortgage, but plaintiff alleges that, until that loan transaction closed in May 2021, he "worried constantly" about denial of the loan and losing his deposit. *Id.* ¶ 44.

More broadly, plaintiff alleges "severe emotional distress" because of APG's "false credit reporting and telephone harassment." *Id.* ¶ 45. This distress has included various physical manifestations, including sleeplessness, loss of weight and appetite, nausea, irritability, and fainting. *Id.* ¶ 46.

The Complaint also asserts that "APG's conduct is part of a pattern and practice of ignoring judicial decisions *to which it has itself consented* and then collecting and attempting to collect money that is not owed." *Id.* ¶ 47 (emphasis in original). As an example, the Complaint cites *Manto v. Aberdeen Proving Ground Federal Credit Union*, Case No. C-13-CV-20-000649 (Harford Cty. Cir. Ct.). ECF 1, ¶ 48.

Additional facts are included in the Discussion, *infra*.

## II. Standards of Review

## A. Summary Judgment

As noted, the Motion is styled as a "Motion to Dismiss Or, Alternatively, For Summary Judgment." ECF 20. A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md, 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir, 1998).[13]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

However, summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Pont de Nemours and Co. v. Kolon Indus.*,

146

*Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). But, "the party opposing summary judgment cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that . . . discovery is necessary, the facts identified in a Rule 56 affidavit must be `essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Financial*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

As discussed below, most of the documents attached to the Motion, as well as the Opposition, may be considered at the Rule 12(b)(6) stage, without conversion to summary judgment. But, conversion would be required to consider an Affidavit by an APG employee making various assertions as to plaintiff's Loan, including APG's "understanding" of its agreement with plaintiff and the meaning of the 2018 Order. ECF 20-2 (Affidavit of John Maschal, APG Vice President of Member Solutions), ¶ 13; *see generally id.* And, conversion would likewise be required to consider an Affidavit of plaintiff (ECF 22-6), setting forth his contrary understanding of his negotiations and agreement with APG, as well as a related email chain. *See* ECF 22-4 (email chain).

In his Opposition and the accompanying Rule 56(d) Affidavit of plaintiff's counsel, plaintiff argues that APG's assertions regarding its intentions and agreement with plaintiff are contested factual questions, for which discovery is appropriate. ECF 22 at 5-6; ECF 22-2. Among other things, plaintiff claims a need for discovery regarding the business records of APG that allegedly support APG's assertions, and also seeks to conduct depositions of Maschal and other APG employees. ECF 22-2, ¶¶ 3-7.

Plaintiff and APG dispute factual questions relating to the meaning of their negotiations and agreements, which are of relevance to the case. When a contract is ambiguous, "`the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cty. Commissioners of Charles Cty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted). Resolution of the disputes may require consideration of evidence extrinsic to a contract. This factual dispute, for which extrinsic evidence is potentially admissible, makes discovery appropriate.

Accordingly, I agree with plaintiff that conversion to summary judgment, without the benefit of discovery, would be premature. As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray*, 741 F.3d at 483; *accord Putney*, 656 Fed. App'x at 639. Therefore, I shall construe the Motion as a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).

## B. Motion to Dismiss

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 1028, 1029 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), aff'd sub nom., *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; see *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for `all civil actions'. . . ." (citation omitted)); see also *Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "`naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; see *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court `must accept as true all of the factual allegations contained in the complaint,' and must `draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); see *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); see *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), cert. denied, 566 U.S. 937 (2012).

Courts ordinarily do not "`resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where

facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense `clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the `documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document is integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its `very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of `matters of public record' and other information that, under Federal Rule of Evidence 201, constitute `adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of

149

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Under these principles, I may consider most of the exhibits provided with the Motion and the Opposition. Most of the documents are records concerning proceedings in Maryland courts. *See* ECF 20-4 (Docket for *Aberdeen Proving Ground Federal Credit Union v. Rodney T Jones,* Case No. 12-C-17-002882 (Harford Cty. Cir. Ct.)); ECF 20-5 (Stipulation); ECF 20-6 (2018 Order); ECF 20-7 (Docket for *Monarc Constr. Inc. v. Aris Corp. et al.,* Case No. 267181V (Montgomery Cty. Cir. Ct.)); ECF 22-2 (2018 Motion); ECF 22-3 (Line of Satisfaction). And, the Court may "take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC,* PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd,* 639 Fed. App'x. 200 (4th Cir. 2016); *see also* Fed. R. Evid. 201(b)(2); *Schultz v. Braga,* 290 F. Supp. 2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice of dockets in state proceedings).

ECF 20-8 is a decision issued by another judge of this Court. *See Payne v. Ford Motor Credit Co.,* SAG-20-00034, 2020 WL 5250287 (D. Md. Sept. 3, 2020). Of course, judicial decisions may be considered for guidance. And, ECF 20-3 is plaintiff's Note, which is integral to his Complaint. Finally, ECF 20-5 is an email conversation between plaintiff and APG's counsel, relating to plaintiff attempting to pay his debt, as referenced in the Complaint. *See* ECF 1, ¶¶ 6-7. Neither plaintiff nor APG object to the consideration of, or dispute the authenticity, of any of these documents. However, as noted, the Maschal Affidavit (ECF 20-2); plaintiff's Affidavit (ECF 22-6); and an additional email chain offered by plaintiff (ECF 22-4) cannot be considered at the Rule 12(b)(6) stage, because they are not referenced in the Complaint, are not integral to it, nor do they fall within any other exception.

## C. Choice of Law

This case involves questions of both Maryland and federal law. But, neither plaintiff nor APG has addressed the matter of choice of law. Instead, both assume that Maryland law applies, without further discussion.

Count III and Count VII of the Complaint, both of which assert claims under the FCRA, invoke the Court's federal question jurisdiction under 28 U.S.C. § 1331. *See* ECF 1 at 3, ¶¶ 12; 77-88, 117-36. The remaining counts are lodged under Maryland law, pursuant to the Court's supplemental jurisdiction. *See* ECF 1 at 3, ¶ 13; *see also* 28 U.S.C. § 1367.

For a state law claim considered under supplemental jurisdiction, the Court must apply the law of the forum state, namely Maryland, including as to choice of law. *See, e.g., Nash v. Montgomery Cty.,* GJH-20-1138, 2021 WL 1222874, at *7 n.7 (D. Md. Mar. 31, 2021); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC,* 529 F. Supp. 2d 604, 606 (D. Md. 2008).

For a contract claim, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g. Cunningham v. Feinberg,* 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan,* 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.,* 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.,* 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd,* 437 Md. 372, 86 A.3d 1245 (2014). "In Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp.,* 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v. Pasadena Receivables, Inc.,* 398 Md. 611, 921 A.2d 799, 803-05 (2011)); *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187.

150

Plaintiff is a resident of Maryland, and APG's principal office is in Maryland. ECF 1 at 3. The Note lacks a choice of law clause, but appears to have been formed in Aberdeen, Maryland. *See* ECF 20-3 at 1. And, the Stipulation contains a clause providing that it "shall be construed and governed in accordance with the laws of the State of Maryland." ECF 20-5 at 3. Therefore, to the extent that any of plaintiff's claims sound in contract, I will apply Maryland law.

In tort actions, Maryland adheres to the rule of *lex loci delicti,* meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph,* 529 F. Supp. 2d at 606 (citing *Erie Ins. Exch. v. Heffernan,* 399 Md. 598, 619, 925 A.2d 636, 648–49 (2007)) (other citations omitted); *see also DiFederico v. Marriott Int'l, Inc.,* 677 Fed. App'x 830, 833 (4th Cir. 2017). As plaintiff is a resident of Maryland, it appears that any alleged harms would have occurred in Maryland. Accordingly, I will look to Maryland law with respect to the analysis of plaintiff's claims sounding in tort.

Finally, as to issues such as merger and the effect of the 2018 Order, "[f]ederal courts must give the same preclusive effect to a state court judgment as the forum that rendered the judgment would have given it." *Sartin v. Macik,* 535 F.3d 284, 287 (4th Cir. 2008); *see also* 28 U.S.C. § 1738; *Jaffe v. Accredited Surety and Casualty Co., Inc.,* 294 F.3d 584, 590-93 (4th Cir. 2002); RESTATEMENT (SECOND) OF JUDGMENTS (the "Restatement of Judgments"), § 18 (applying this principle to merger). Here, the 2018 Order was issued by a Maryland court. So, I will look to the preclusive effect it would be given in a Maryland court under Maryland law.

## III. Discussion

### A.

The dispute between plaintiff and APG boils down to contrary views concerning the effect of the Stipulation and the 2018 Order.

As noted, APG asserted that plaintiff owed an additional debt on the Loan, beyond the amount reflected in the Stipulation. According to APG, subject to regular payments by Jones, as specified in the Stipulation, APG suspended its right to reopen the State litigation "and adjudicate the remaining disputed unpaid Loan debt. . . ." ECF 20-1 at 3. But, it contends that it never waived or settled the right to do so. *Id.* To the contrary, APG contends that, because plaintiff defaulted on the Stipulation, APG had the right to pursue the additional, disputed debt, notwithstanding the 2018 Order or plaintiff's satisfaction of the judgment. *Id.* at 1-3, 5-9; ECF 27 at 1-2, 4-6. Indeed, APG asserts that Jones satisfied the 2018 Order on February 12, 2021, but "has continued to make payments on the disputed unpaid Loan balance." ECF 20-1 at 3.

In the Motion, APG maintains that the 2018 Order is not a final judgment; did not modify the Loan balance; and did not merge with the Loan or preclude APG's Loan claim. ECF 20-1 at 3, 5-9. Therefore, it asks the Court to find "as the law of the case" that the 2018 Order is interlocutory, "and not the final disposition of the claims" in the State litigation. ECF 20 at 1-2.

In plaintiff's view, when APG agreed to the Stipulation and then obtained the 2018 Order after plaintiff defaulted, APG relinquished the right to pursue the recovery of any additional amount, beyond what was specified in the 2018 Order. ECF 1 at 4-5, ¶¶ 3, 10; ECF 22 at 1-4, 6-10. In the Opposition, plaintiff does not contest APG's premise that, if the 2018 Order is as described by APG, then his claims must be dismissed. But, plaintiff argues that the Stipulation provided for APG's total claim; that the 2018 Order was a final judgment; and that APG's contractual rights under the Loan merged into the 2018 Order. ECF 22 at 6-10.

### 1.

The dispute between plaintiff and APG as to whether the 2018 Order is a "final judgment" is intertwined with their disagreement about whether PG's individual rights as to the Loan merged into the 2018 Order. "[I]n Maryland, . . . under the rule of merger, `a simple contract is merged in a judgment or decree rendered upon it, and . . . all its powers to sustain rights and enforce liabilities terminated in the judgment or decree. . . .'" *Monarc Constr., Inc. v. Aris Corp.*, 188 Md. App. 377, 394, 981 A 2d 822, 832 (2009) ("*Monarc*") (quoting *Jackson v. Wilson,* 76 Md. 567, 571, 25 A. 980, 981 (1893)) (alterations mine); *see also Cain v. Midland Funding, LLC,* No. 0530, 2016 WL 1597179, at *9 (Md. Ct. Spec. App. Apr. 21, 2016) ("Maryland appellate courts recognize that, under the rule of merger, `a simple contract is merged in a judgment or decree rendered upon it, and that all its powers to sustain rights and enforce liabilities terminate[ ] in the judgment or decree. . . .'") (internal citations omitted), *rev'd on other grounds,* 452 Md. 141, 156 A.3d 807 (2017); *United Book Press. Inc. v. Maryland Composition Co, Inc.,* 141 Md. App. 460, 479, 786 A.2d 1, 9 (2001) ("[A] claim merges into a judgment obtained with respect to that claim.").

Maryland courts look to the Restatement of Judgments when discussing the concept of merger. *See, e.g., Cain,* 2016 WL 1597179, at *9; *Monarc,* 188 Md. App. at 394, 981 A.3d at 831-32; *Accubid Excavation, Inc. v. Kennedy Contractors, Inc.,* 188 Md. App. 214, 232, 981 A.2d 737 (2009). Restatement of merger as follows (emphasis added):

When a *valid and final personal judgment* is rendered in favor of the plaintiff:

> (1) The plaintiff cannot thereafter maintain an action on the original claim or any part thereof, although he may be able to maintain an action upon the judgment; and

> (2) In an action upon the judgment, the defendant cannot avail himself of defenses he might have interposed, or did interpose, in the first action.

"When the plaintiff recovers a valid and final personal judgment, his original claim is extinguished and rights upon the judgment are substituted for it. The plaintiff's original claim is said to be `merged' in the judgment." *Id.* cmt. a. Moreover, "[i]t is immaterial whether the judgment was rendered upon a verdict or upon a motion to dismiss or other objection to the pleadings or upon consent, confession, or default." *Id.*

As articulated by the Restatement of Judgments, merger is only implicated by a "final personal judgment." Restatement of Judgments § 18. Under Maryland law, "[t]o constitute a final judgment, a trial court's ruling `must either decide and conclude the rights of the parties involved or deny a party the means to prosecute or defend rights and interests in the subject matter of the proceeding.'" *Md. Bd. of Physicians v. Geier,* 451 Md. 526, 545, 154 A.3d 1211, 1222 (2017) (quoting *Harris v. State,* 400 Md. 300, 312, 22 A.3d 886, 893 (2011)).

"Additionally, for a judgment to be final, the ruling must also contain the following three attributes: `(1) it must be intended by the court as an unqualified, final disposition of the matter in controversy[;] (2) unless the court acts pursuant to Maryland Rule 2-602(b) to direct the entry of a final judgment as to less than all the claims or all the parties, it must adjudicate or complete the adjudication of all claims against all parties; [and] (3) it must be set forth and recorded in accordance with [Maryland] Rule 2-601.'" *Md. Bd. of Physicians,* 451 Md. at 545, 154 A.3d at 1222 (quoting *Metro Maintenance Systems South, Inc. v. Milburn,* 442 Md. 289, 298, 112 A.3d 429, 298 (2015)) (alterations in *Md. Bd. of Physicians*). Maryland Rule 2-601 contains requirements for the preparation and entry of judgment by the clerk of court upon the issuance of a jury verdict or decision by a court.

APG mounts a cursory argument that the 2018 Order did not comply with the third requirement for a final judgment, namely that the court set forth and record the judgment under Maryland Rule 2-601. *See* ECF 20-1 at 6-7. This is not persuasive: the Notice of Recorded Judgment docketed by the Clerk of the Circuit Court, along with the 2018 Order, appear to be precisely the documents contemplated by Rule 2-601.

152

The question of whether the underlying Loan contract merged into the 2018 Order, and the question of whether the 2018 Order is a final judgment, depend to a considerable degree on how the Court interprets the Stipulation, which led to the 2018 Order. As noted, plaintiff takes the position that the Stipulation established the total amount owed by plaintiff to APG, and the sole remedy if plaintiff defaulted on the Stipulation, namely the consent judgment. Thus, even if plaintiff defaulted on the Stipulation, by seeking the consent judgment contemplated by the Stipulation, APG could not then seek any additional Loan amount beyond the 2018 Order.

If this is so, it is difficult to see how the 2018 Order could be anything other than a final judgment, into which the underlying contract merged. In this case, the 2018 Order would have conclusively determined the amount owed by plaintiff to APG. In other words, the 2018 Order would have "'decide[d] and conclude[d] the rights of the parties involved,'" and "'complete[d] the adjudication of all claims against all parties.'" *Md. Bd. of Physicians*, 451 Md. at 545, 154 A.3d at 1222 (internal quotations omitted). Similarly, by reopening the case to grant the consent judgment contemplated by the Stipulation, and not providing for any further action in the case, the 2018 Order could be seen as "intended by the court as an unqualified, final disposition of the matter in controversy." *Md. Bd. of Physicians*, 451 Md. at 545, 154 A.3d at 1222. And, this final judgment would extinguish the original contractual claim for the Loan, substituting the 2018 Order. Restatement of Judgements, § 18.[14]

On the other hand, APG argues that plaintiff materially breached the Stipulation by defaulting. Therefore, APG maintains that it was entitled to pursue the entire amount owed on the Loan, notwithstanding the consent judgment obtained pursuant to the Stipulation.

If the Stipulation permits such a course, then the argument that the 2018 Order constitutes a final judgment is tenuous. If APG could continue to pursue the overall Loan amount in the action, then the 2018 Order would not have "'decide[d] and conclude[d] the rights of the parties involved,'" or "'complete[d] the adjudication of all claims against all parties.'" *Md. Bd. of Physicians, 451 Md. at 545, 154 A.3d at 1222* (internal quotations omitted). Likewise, the 2018 Order, granting a motion to "Reopen Case" (ECF 22-2 at 1), could be interpreted to have reopened the case for more than simply granting the consent judgment, even if that was the focus of the Order. And, without a final judgment, no merger would occur. Restatement of Judgments, § 18.

*Monarc*, 188 Md. App. 377, 981 A.2d 822, is cited by both parties on the issue of final judgment. But, in my view, it is not dispositive. There, the parties, a contractor and a subcontractor, entered into a settlement agreement to resolve litigation between them. *Id.* at 381, 981 A.2d at 824. After defendants allegedly defaulted, Monarc sued on the settlement agreement and obtained a default judgment. *Id.* at 381-82, 981 A.2d at 824. Monarc then filed suit again, seeking contractual attorney's fees. *Id.* at 383-84, 981 A.2d at 825-26. The trial court dismissed the suit, on the basis of merger, and the Maryland Court of Special Appeals affirmed. *Id.* The court concluded that the "sole basis" for Monarc's claim to attorney's fees was the settlement agreement, which had merged into the default judgment. *Id.* at 399, 981 A.2d at 834-35.

In contrast to the case *sub judice,* in *Monarc* there was no dispute that Monarc's claim for attorney's fees derived solely from the settlement agreement, which was the basis for the suit in which it obtained default judgment. *Id.* at 382, 393, 399, 981 A.2d at 824, 831, 834-35. Here, APG asserts that its claim for the additional Loan amounts derives from the underlying Loan, not the Stipulation, and that the 2018 Order did not resolve the original suit to collect on the Loan. *See, e.g.,* ECF 20-1 at 3, 8; ECF 27 at 4, 5.

On the other hand, differences between *Monarc* and this case, identified by APG, are not persuasive. APG notes that *Monarc* involved a default judgment, following testimony and proof of damages in open court. ECF 20-1 at 8. But, for purposes of the merger doctrine, "[i]t is immaterial whether the judgment was rendered upon a verdict or upon a motion to dismiss or other objection to the pleadings or upon consent, confession, or default." Restatement of Judgments, § 18 cmt. a. In addition, APG highlights minor differences in

the phrasing of the docket entries for judgment in *Monarc* and this case, as well as the fact that the *Monarc* docket was marked "closed" while this case was marked "closed/inactive." ECF 20-1 at 8-9. These distinctions do not provide a meaningful basis to distinguish the cases.

## 2.

Thus, the Court proceeds to examine the terms of the Stipulation. "Maryland law provides that `[s]ettlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts.'" *Medicine Shoppe Int'l, Inc. v. Siddiqui*, 549 Fed. App'x 131, 134 (4th Cir. 2013) (internal citation omitted). Indeed, "[t]he policy of encouraging settlement is so important that, even when the parties later discover that the settlement may have been based on a mistake, settlement agreements will not be disturbed." *Nationwide Mut. Ins. Co. v. Voland*, 103 Md. App. 225, 237, 653 A.2d 484, 491 (1995).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).

Maryland adheres to the law of objective interpretation of contracts, so that "`the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.'" *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md, 157, 166, 829 A.2d 540, 545 (2003) (citation omitted); *see Cochran v. Norkunas*, 398 Md, 1, 16, 919 A.2d 700, 709 (2007); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App, 405, 417, 103 A.3d 1133, 1139 (2014); accord *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 306 (4th Cir. 2020). Thus, the court's task is not to imagine what the parties intended at the time of the agreement but to "`determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 52, 73 A.3d 224, 232 (2013) (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see Parkway 1046, LLC, 961 F.3d at 307*.

To determine the parties' intention, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "`The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md, 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g., Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md, App, 217, 291, 674 A.2d 106, 142 (1996) ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

The determination of whether a contract is ambiguous is a question of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Washington*, 376 Md. at 163, 829 A.2d at 544. Notably, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App, 278, 299, 681 A.2d 568, 578 (1996). Rather, a contract is ambiguous "when the language of the contract is susceptible of more than one meaning to a reasonably prudent person." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *see also Cochran*, 398 Md. at

154

17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999).

To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

Nevertheless, the Court cannot resolve any factual disputes or ambiguity at the motion to dismiss stage. *See 1899 Holdings, LLC v. 1899 Liab. Co.*, 568 Fed. App'x. 219, 224 (4th Cir. 2014) ("In a contract dispute, the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.") (internal quotation omitted); *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) (reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 736 (D. Md. 2005) (holding that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

The Stipulation (ECF 20-5) contains provisions that can be construed to support either interpretation. Indeed, plaintiff and APG each emphasize particular provisions that support their positions. *See* ECF 22 at 6-8; ECF 27 at 1-2, 5. Therefore, I conclude that the Stipulation is ambiguous, and a determination as to its interpretation is not proper at this juncture.

Certain provisions of the Stipulation support the argument that, in the event of default by plaintiff, APG's recourse under the Stipulation was to seek a consent judgment for the amounts recited in the Stipulation, and not for any additional claim. In particular, the Stipulation provides that, "[i]n the event of default," which is defined as the failure by Jones to make the payments described in the Stipulation, Jones "consents to judgment in the full amount as indicated in the Recitals above, less credit for payments made." ECF 20-5 at 2. And, the recitals reflect that Jones has admitted to an unpaid principal balance of $35,557.67, plus interest and attorney's fees. *Id.* at 1. Furthermore, the Stipulation is a "Stipulation of Settlement & Dismissal Under MD Rule 2-506(b)." *Id.* Maryland Rule 2-506(b) provides: "If an action is settled upon written stipulated terms and dismissed, the action may be reopened at any time upon request of any party to the settlement *to enforce the stipulated terms* through the entry of judgment or other appropriate relief." (Emphasis added.)

Conversely, other provisions of the Stipulation could be read to buttress APG's position that, in the event of default by plaintiff, APG could move to collect the entire Loan amount that was allegedly unpaid, not simply the amount recited in the Stipulation. Most notably, the Stipulation provides: "[Jones] agrees to pay and [APG] agrees to accept [the amounts stated in the Recitals] in full satisfaction of the claim *provided [Jones] complies with the provisions of this Stipulation.*" ECF 20-5 at 1 (emphasis added). Of course, if Jones did not make the payments required by the Stipulation, then he would not be in compliance with its provisions. In addition, the portion of the Stipulation relating to the consent judgment in the event of default does not explicitly state that such a consent judgment would be the sole remedy for default. *See id.* at 2.

The purpose of the Stipulation was to resolve the dispute between Jones and APG regarding the unpaid Loan balance, without the expense of litigation. *See* ECF 20-5 at 1. Under the circumstances, it is reasonable that APG might compromise on the overall amount owed, even in the event of default, in order to avoid litigation, increase the chances of recovery, and provide for an expedited consent judgment process should default occur. But, likewise, it is reasonable that APG might insist that it be able to recover the full amount in the event of default, as an inducement for Jones to perform.

155

Considering the written language of the Stipulation as well as its character, purpose, and the facts and circumstances of the parties' dealings, as a matter of law, the language in the Stipulation is susceptible to only one meaning to a reasonably prudent person. *See Auction & Estate Representatives, Inc.*, 354 Md. at 340, 731 A.2d at 444-45; *Pacific Indem. Co.*, 302 Md. at 388, 488 A.2d at 488; *Forty W. Builders, Inc.*, 178 Md. App. at 377, 941 A.2d at 1209.

In a related argument, APG contends that plaintiff materially breached the Stipulation by defaulting. As a result, APG asserts that it was relieved of any obligation under the Stipulation to accept the compromised amount. *See* ECF 20-1 at 7-8; ECF 27 at 4-5. But, this argument is not sufficient to grant the Motion.

"Under Maryland law, `[a] breach is material if it affects the purpose of the contract in an important or vital way.'" *Jay Dee/Mole Joint Venture v. Mayor and City Council of Baltimore*, 725 F. Supp. 2d 513, 526 (D. Md. 2010) (quoting *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005)) (alteration in *Jay Dee*). "`Whether a given breach is material or essential, or not, is a question of fact.' There are instances, however, when the issue is so clear that it may be decided as a matter of law. *Barufaldi v. Ocean City, Chamber of Commerce, Inc.*, 196 Md. App. 1, 23, 7 A.3d 643, 657 (2010) (internal citation omitted).

Even assuming that plaintiff's asserted default under the Stipulation is so clear that it may be considered a material breach as a matter of law, the effect is not so simple. It is true that, as a general matter under Maryland law, "a material breach discharges the non-breaching party of its duty to perform" under a contract. *Jay Dee/Mole Joint Venture*, 725 F. Supp. 2d at 526 (citing 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.) ("Williston")). But, at the same time:

> When there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform. In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply when the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.

14 Williston § 43:15 (footnotes omitted).

"[T]he nonbreaching party, by electing to continue receiving benefits under the agreement, cannot then refuse to perform its part of the bargain." 13 Williston § 39:32. *See also, e.g.*, *Lazorcak v. Feuerstein*, 273 Md. 69, 74-75, 327 A.2d 477, 480-81 (1974); *Pumphrey v. Pelton*, 250 Md. 662, 671, 245 A.2d 301, 306 (1968); *Monument Bank v. American Bank, FSB*, No. 2242, 2017 WL 2666162, at *5 (Md. Ct. Spec. App. June 21, 2017); *Brown v. Brown*, No. 0947, 2016 WL 3460305, at *4-5 (Md. Ct. Spec. App. June 23, 2016). Here, after plaintiff allegedly defaulted, APG did not attempt to rescind the Stipulation. To the contrary, it promptly sought the consent judgment contemplated in the Stipulation in the event of default. *See* ECF 20-5 at 2; ECF 22-2. And, its 2018 Motion explicitly referenced that, under the Stipulation, plaintiff agreed to a consent judgment if he defaulted. *See* ECF 22-2 at 1. In other words, after plaintiff's asserted material breach, APG sought to hold plaintiff to performance under the Stipulation, and to receive the benefit of the Stipulation in the form of the consent judgment.

Furthermore, even in the case of a material breach, "`the rights and liabilities of the parties may be governed by an express stipulation in the contract indicating what the effect of a breach will be.'" *Merriweather Post Business Trust v. It's Not My Amphitheater, Inc.*, No. 2594, 2020 WL 4530659, at *18 (Md. Ct. Spec. App. Aug. 6, 2020) (internal

citation omitted). Depending on the construction given to the Stipulation, as discussed above, one Stipulation could be read to explicitly contemplate what a third recourse would be in the event of a material breach by plaintiff—namely, it could seek the consent judgment.

In sum, I conclude that the disagreement between plaintiff and APG as to the construction given to the Stipulation is not suitable for resolution at the motion to dismiss stage. And, as discussed, their disputes as to whether the 2018 Order constituted a final judgment, and the effect of the 2018 Order on the amount owed by plaintiff under the Loan, turn in large part on the interpretation given to the Stipulation. Therefore, I decline to grant the Motion on this basis.

APG does not make any further argument as to Count I (the MCDCA), Count II (the MCPA), or Count VII (specific performance), beyond its overall argument above. Because I have rejected that argument at this juncture, those counts may proceed. But, APG makes additional arguments concerning Count III (the FCRA), Count IV (defamation), and Count V (intrusion upon seclusion). I turn to those contentions.

## B.

### 1.

Count III alleges that APG violated the FCRA, specifically 15 U.S.C. § 1681s-2(b), by failing to conduct a reasonable investigation of plaintiff's disputes with Experian and Equifax. ECF 1, ¶¶ 77-88. As to Count III, the Motion focuses on APG's overall argument, discussed above. But, APG also contends that plaintiff has inadequately alleged that Experian and Equifax notified APG of his dispute, and that APG breached its duty to investigate. ECF 20-1 at 10.

The FCRA is "a comprehensive statutory scheme designed to regulate the consumer reporting industry." *Ross v. F.D.I.C.*, 625 F.3d 808, 812 (4th Cir. 2010). Among other things, it creates a duty for furnishers of credit information to provide accurate information to credit reporting agencies ("agencies"), as well as a duty to correct inaccuracies and to investigate disputed information upon notice. 15 U.S.C. § 1681s-2. In particular, § 1681s-2(b) imposes requirements upon persons who provide information to agencies, upon receiving notice by an agency of a dispute by a consumer or reseller involving that information. *See* 15 U.S.C. § 1681s-2(b); *id.* § 1681i(a)(2). After receiving notice, such a furnisher must investigate the disputed information; review all relevant information provided by the agency; report the results of the investigation to the agency; report any inaccurate or incomplete information to all other agencies; and modify, delete, or block an inaccurate or incomplete item of information for the purposes of reporting to agencies. *Id.* § 1681s-2(b)(1). In short, this provision "requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004).

"[T]o bring a claim under § 1681s-2(b), a plaintiff must establish three elements: (1) that he or she notified the consumer reporting agency of the disputed information, (2) that the consumer reporting agency notified the defendant furnisher of the dispute, and (3) that the furnisher then failed to investigate and modify the inaccurate information." *Ausar-El v. Barclay Bank Del.*, PJM-12-082, 2012 WL 3137151, at *3 (D. Md. July 31, 2012). APG contests whether plaintiff has adequately alleged the final two prongs.

As to the second prong, the Complaint alleges that both Equifax and Experian responded to plaintiff's dispute as to his credit information, as part of which they reported the response they received from APG when they passed along the dispute. ECF 1, ¶¶ 21, 24. These details sufficiently allege that Experian and Equifax notified APG regarding the dispute.

And, as for the third prong, some of plaintiff's allegations are premised on the argument that plaintiff did not actually owe money on the Loan, an issue discussed above. That argument is not ripe for resolution. In addition, plaintiff alleges that APG reported inconsistent information to Equifax and Experian, which then reported inconsistent information to plaintiff. *Id.* at 5-6, ¶¶ 12, 14, 22, 24. For example, on March 26, 2021, Experian reported to plaintiff that APG had certified that its information—that plaintiff owed $50,356—was accurate. *Id.* ¶¶ 12, 21. But, the same day, after exchanging information with APG, Equifax reported to plaintiff a corrected (but still allegedly inaccurate) amount of $28,249. *Id.* ¶¶ 24-25.

The alleged reporting of inconsistent information in this fashion is sufficient for a 15 U.S.C. § 1681s-2(b) claim to survive a Rule 12(b)(6) motion. *See, e.g., Magruder v. Educational Systems Fed. Credit Union,* 194 F. Supp. 3d 386, 390 (D. Md. 2016); *Alston v. Wells Fargo Bank, N.A.,* AW-12-3671, 2013 WL 990416, at *4-5 (D. Md. Mar. 12, 2013). Accordingly, I shall deny the Motion as to Count III.

## 2.

In Count IV, plaintiff lodges a claim of defamation against APG. ECF 1, ¶¶ 89-94. In particular, the Complaint alleges that APG falsely reported to Equifax, Experian, and TransUnion that plaintiff owed money and was delinquent, and that APG acted with malice because it knew that the statement was false, or recklessly disregarded its falsity. *Id.* APG attacks this claim solely on the ground that plaintiff has not adequately alleged the malice or willful intent to injure required by the FCRA to bring a state law defamation claim. ECF 20-1 at 11.

Of relevance here, the FCRA, 15 U.S.C. § 1681h(e), preempts state law defamation suits "with respect to the reporting of information against . . . any person who furnishes information to a consumer reporting agency," such as APG, "based in whole or in part on [a consumer] report *except as to false information furnished with malice or willful intent to injure such consumer.*" (Emphasis added.)[15]

"To establish malice, Plaintiff must allege that a defendant published material while entertaining serious doubts as to the truth of the publication or with a high degree of awareness of probable falsity," or with actual knowledge that the information was false. *Beuster v. Equifax Info. Services,* 435 F. Supp. 2d 471, 480 (D. Md. 2006) (citing *Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1551 n.8 (4th Cir.1994)). "Pursuant to Rule 9(b), `malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *Magruder,* 194 F. Supp. 3d at 391 (quoting Fed. R. Civ. P. 9(b)) (discussing Rule 9(b) in the credit reporting defamation context). And, "[a]t the `nascent stage of litigation' presented by a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Federal Rules require only a general pleading of malice." *Beuster,* 435 F. Supp. 2d at 480 (quoting *Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406, 410 (2nd Cir. 2000)).

Applying this standard, Count IV is adequate to survive the motion to dismiss. The Complaint alleges that APG "acted with malice because it knew that the statement [that plaintiff owed money and was delinquent] was false or recklessly disregarded the falsity of the statement." ECF 1, ¶ 93. Again, much of this count is founded on the argument that plaintiff did not actually owe any outstanding amount on the Loan, an issue that will have to wait for factual development. Furthermore, APG allegedly reported inconsistent information to Experian and Equifax in roughly the same time period (*see id.* at 5-6, ¶¶ 12, 14, 21-25), which supports the assertion that APG had a "high degree of awareness of probable falsity" of the information it was reporting. *Beuster,* 435 F. Supp. at 480.

## 3.

Count V of the Complaint is titled "Invasion of Privacy — Intrusion Upon Seclusion." ECF 1 at 16. APG contends that plaintiff has failed adequately to allege facts sufficient to support the tort of intrusion upon seclusion. ECF 20-1 at 11-13.

"Intrusion upon seclusion is one of the torts under invasion of privacy." *Demo v. Kirksey, 2008 WL 5235992, at *5 (D. Md. Dec. 15, 2008)* (citing *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 161, 502 A.2d 1101, 1115 (1986)). Intrusion upon seclusion occurs where there is an "intentional intrusion upon the solitude or seclusion of another or her private affairs or concerns that would be highly offensive to a reasonable person." *Furman v. Sheppard*, 130 Md. App. 67, 73, 744 A.2d 583, 585 (2000) (citing RESTATEMENT (SECOND) OF TORTS (the "Restatement of Torts") § 652B); *see Gamble v. Fradkin & Weber, P.A.*, 846 F. Supp. 2d 377, 383 (D. Md, 2012); *see Lipscomb v. Aargon Agency, Inc.*, PWG-13-2751, 2014 WL 5782040, at *2 (D. Md. Nov. 5, 2014); *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 525-26, 687 A.2d 1375, 1380-81 (1997); *Mitchell v. Balt. Sun Co.*, 164 Md. App. 497, 522, 883 A.2d 1008, 1022 (2005).

"A trespass `becomes relevant only when it invades a defendant's reasonable expectation of privacy.'" *Furman*, 130 Md. App. at 74, 744 A.2d at 586 (citation omitted). Conduct that a particular plaintiff finds offensive, but that would not offend a reasonable person, cannot establish intrusion upon seclusion. *Whye v. Concentra Health Servs., Inc.*, ELH-12-3432, 2013 WL 5375167, at *14 (D. Md. Sept. 24, 2013), *aff'd*, 583 Fed. App'x 159 (4th Cir. 2014). Rather, intrusion upon seclusion requires a "'substantial'" intrusion, judged by an objective reasonableness standard; it is irrelevant whether a particular plaintiff subjectively found conduct to be highly offensive. *Id.* at *14 (quoting Restatement of Torts § 652B, cmt. d). Moreover, "[a]n intrusion upon seclusion claim requires that the matter into which there was an intrusion is entitled to be private and is kept private by the plaintiff. *Barnhart v. Paisano Pubs., LLC*, 457 F. Supp. 2d 590, 593 (D. Md. 2006); *accord Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 877 (8th Cir. 2000) ("A legitimate expectation of privacy is the touchstone of the tort of intrusion upon seclusion.").

In *Dorris v. Accounts Receivable Management, Inc.*, GLR-11-3453, 2013 WL 1209629, at *9 (D. Md. Mar. 22, 2013), the court explained: "[T]he Maryland Court [of Appeals] established two factors to be considered in determining whether the evidence is sufficient to establish a jury question for invasion of privacy: (1) whether the frequency of the communication indicates a pattern of harassment; or, if the communication is `not of such frequency as to constitute harassment,' (2) whether the communication possesses a `vicious quality.'" (quoting *Household Fin. Corp. v. Bridge*, 252 Md. 531, 541, 250 A.2d 878, 884 (1969)).

Case law has further developed the tort of intrusion upon seclusion in the context of debt collection. "Courts have found creditors' actions reasonable when they constitute non-invasive attempts to collect a debt. . . . Only when such conduct becomes more persistent, deliberate, or vile do courts begin to consider it unreasonable." *Gamble*, 846 F. Supp. at 383.

The Restatement of Torts, § 652B, cmt. d, provides:

> There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.

In *Household Finance Corp. v. Bridge*, 252 Md. 531, 250 A.2d 878 (1969), the Maryland Court of Appeals rejected the contention that "five or six phone calls to the [plaintiff from the defendant], and two or three to her parents (who actually signed the note), over a period of eleven months, constituted a pattern of harassment" justifying an intrusion claim. *Id.* at 542, 250 A.2d at 885. The court contrasted these facts with out-of-state cases upholding a claim where, for example, a creditor's agent made three calls to the debtor's family members, suggesting an illicit relationship, or where the creditor called

159

the debtor six to eight times a day for three weeks, including late at night, and also called the debtor's workplace, resulting in a threat of lost employment. *Household Fin. Corp.*, 252 Md. at 540-41, 250 A.2d at 884-85.

In *Summit Loans, Inc. v. Pecola*, 265 Md. 43, 288 A.2d 114 (1972), the Maryland Court of Appeals upheld the trial court's decision not to direct a verdict in favor of the defendant in an intrusion upon seclusion claim. In that case, the creditor's representatives called the plaintiff at home over 200 times in a six-month period, averaging between 20-30 calls per week, including late at night, and used threatening and vulgar language towards the plaintiff and her young daughter. *Id.* at 46-49, 288 A.2d at 115-17.[16]

More recently, in *Gamble*, 846 F. Supp. 2d 377, the plaintiff brought an intrusion upon seclusion claim related to the defendant sending a process server to plaintiff's home to serve him with process in a collection action. *Id.* at 383. The debt in question had been discharged in bankruptcy, and the plaintiff no longer owed the debt. *Id.* at 383-84. Nevertheless, the court granted the defendant's motion to dismiss the claim, noting that there was no allegation that the defendant knew the debt was no longer owed at the time process was served, nor was there an assertion that the process server conducted himself in a highly offensive manner. *Id.* at 384.

And, in *Awah v. Wells Fargo Dealer Servs., Inc.,* No. 1872, 2019 WL 410412 (Md. Ct. Sp. App. Jan. 31, 2019), on an intrusion upon seclusion claim, the plaintiff and his wife testified that the defendant called the plaintiff 15 to 17 times as to the plaintiff's loan, including sometimes three times a day. *Id.* at *1. Yet, the Maryland Court of Special Appeals upheld the circuit court's ruling in favor of the defendant on a motion for judgment after the close of plaintiff's case. *Id.* at *2.

Furthermore, "financial harm, such as wrongful garnishment or the filing of a civil action," had not "been found to constitute intrusion upon seclusion." *Payne v. Ford Motor Credit Co., LLC,* SAG-20-034, 2020 WL 5250287, at *5 (D. Md. Sept. 3, 2020). "It is clear, from the Maryland cases interpreting or discussing intrusion upon seclusion, that its reach has been confined to traditional personal privacy interests, and has not been expanded to finances." *Id.* at *6. "Unlike defamation, the intrusion on seclusion tort deals with the manner in which Defendant obtained the information rather than the truth or falsehood of the information itself." *Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 401 (D. Md. 2001) (granting summary judgment for defendant in action by plaintiff alleging that lender had falsely indicated in credit report that she had been involved in, or had filed bankruptcy).

The Complaint alleges that APG called plaintiff "several times" to try to collect on his Loan (ECF 1, ¶ 95), including, "at one point, on a daily basis." *Id.* ¶ 97. APG also allegedly emailed plaintiff for the same purpose. *Id.* ¶ 98. Plaintiff asserts, consistent with his broader allegations, that APG engaged in such conduct even though he had already paid off the account. *Id.* ¶¶ 96-104. Thus, he alleges that APG "coerced" him into making payments he did not owe by threatening him with damage to his creditworthiness. *Id.* ¶¶ 31, 34-35, 42, 100. In addition, plaintiff claims that at one point, APG told him that they would not make an adverse report about him if he made a payment online by March 31, 2021. But, after he did so, APG called him the next day to inform him that the payment had not yet cleared and that it would report that he had missed a payment. *Id.* ¶¶ 35-36.

By itself, the volume of contacts alleged by plaintiff falls far short of the circumstances discussed above, in which the Maryland courts left open the possibility of a claim for intrusion upon seclusion. The allegation of "several calls," at one point daily, is of a lesser volume even than cases in which the tort was rejected. *See Household Fin. Corp.*, 252 Md. at 540-42, 250 A.2d at 884-85 (five to six calls over eleven-month period); *Awah*, 2019 WL 410412, at *1-2 (15-17 calls, including sometimes three per day). Nor is the conduct alleged to have the "vicious quality" seen in some other cases. *Household Fin. Corp.*, 252 Md. at 541, 250 A.2d at 884. APG representatives are not alleged to have been rude, loud, vulgar, or abrasive, or to have called at inappropriate times, or spoken with anyone besides plaintiff.

160

But, the question is whether the allegation that APG was "coercing" plaintiff to make payments he was not required to make is enough. In general, if a lender engages in otherwise reasonable conduct aimed at collecting debt, the intrusion upon seclusion tort will not apply even if the plaintiff believes he does not owe the debt, and even if he turns out to be right. *See Gamble*, 846 F. Supp. 2d at 383-84. The tort is aimed at the manner in which defendant acts, not the truth or falsity of the information at issue. *See Trundle*, 162 F. Supp. 2d at 461.

The crucial distinction here is that, unlike in *Gamble*, the Complaint alleges that APG knew that plaintiff did not owe the asserted amounts. ECF 1, ¶¶ 10, 15, 93. At this stage, I must take these allegations as true; the issue of whether plaintiff did, in fact, owe this debt is not ripe for resolution at this time. And, a reasonable person could well find it highly offensive for a lender to continue to contact him, seeking to force him to make payments it *knows* he does not owe, under threat of damage to his creditworthiness. Although such a communication might lack the viciousness of some of the cases discussed above, such behavior could be considered to have a "vile" quality. *Gamble*, 846 F. Supp. at 383.

Intrusion upon seclusion is a difficult tort to pursue successfully, and plaintiff ultimately may not be able to do so. But, this determination must await further factual development.

## IV. Conclusion

For the reasons stated above, I shall construe the Motion as a motion to dismiss and deny the Motion.

An Order follows, consistent with this Memorandum Opinion.

[1] Both the fifth and sixth counts of the Complaint are captioned "Count V." *See* ECF 1 at 16-17. And, the seventh count is captioned "Count VI." *See id.* at 19. To avoid confusion, I will refer to what should be the sixth count as "Count VI" and I shall refer to what should be the seventh count as "Count VII."

The Complaint restarts its paragraph numbering after paragraph 13, meaning there are two sets of paragraphs with the numbers 1-13. *See* ECF 1 at 3. Therefore, for clarity, when discussing paragraphs 1-13, I specify both the paragraph and the page number.

[2] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

[3] Curiously, the Complaint fails to recount any facts pertinent to the origination of the "second mortgage." However, as discussed, *infra*, I may consider exhibits that clarify the source of the Loan.

[4] I sometimes refer to this litigation as the "circuit court case" or the "State litigation."

[5] The Motion makes this explicit, asserting that the Stipulation was for a "lesser/compromised amount," and that as of March 5, 2018, the unpaid balance on the Loan was "$57,279.28 (principal only)." ECF 20-1 at 2. But, this sum is not supported by any materials that the Court can consider at the Rule 12(b)(6) stage.

[6] The Motion describes the amount sought by the 2018 Motion as the amount in the Stipulation (ECF 20-1 at 3), and the Opposition refers to the 2018 Motion as the one provided for by the Stipulation. ECF 22 at 3. However, the principal amount requested in the 2018 Motion is not identical to the amount specified in the Stipulation. *Compare* ECF 20-5 at 1 ($35,557.67) *with* ECF 22-1 at 1 ($34,367.99).

Notably, the principal requested in the 2018 Motion is less than the principal in the Stipulation. Furthermore, the 2018 Motion does not request the $5,336 in attorney's fees contemplated in the Stipulation. APG acknowledges that the 2018 Motion does not request attorney's fees (*see* ECF 27 at 2 n.2), but otherwise neither plaintiff nor APG explains the discrepancies. The discrepancies are not material to the issues, however.

[7] The Notice of Recorded Judgment matches the consent judgment sought by APG, except that the amount of the judgment in the Notice of Recorded Judgment, before interest, is $34,515.89, rather than $34,367.99. *Compare* ECF 20-6 at 1 *with id.* at 2. The higher sum is presumably the result of adding $147.90, representing the accrued interest through June 18, 2018, to $34,367.99. However, the Notice of Recorded Judgment mentions separately the amount of the accrued interest. The parties have not clarified the discrepancy.

[8] "HELOC" is not defined in the Complaint, but presumably refers to "home equity line of credit," *i.e.*, plaintiff's second mortgage.

[9] "NSF" is not defined in the suit, but presumably refers to "not sufficient funds." APG does not advance any explanation as to NSF checks in its briefing, and it is not clear how this explanation interacts with APG's litigation

position that plaintiff owed additional sums after the satisfaction of the 2018 Order because he still owed the remaining, disputed portion of the court balance that is covered by the 2019 Order.

[10] Aside from this Line of Satisfaction, there are no other docket entries in the State litigation following the 2018 Order and the Notice of Recorded Judgment. *See* ECF 20-4 at 4.

[11] The Complaint uses the term "Credit Reporting Agencies" or "CRAs" to refer to Experian, Equifax, and TransUnion. However, TransUnion is not a defendant in this litigation.

[12] Although this language arguably implies that APG made the allegedly false reports to Equifax, Experian, and TransUnion in January 2021, plaintiff does not explicitly make such an allegation.

[13] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte,* unless it gives notice to the parties that it will do so. *See Laughlin,* 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

[14] The 2018 Order, consistent with the request in the 2018 Motion, awarded an amount that was somewhat less than the amount specified in the Stipulation. *See supra* note 7. But, this would not alter the analysis that APG sought a consent judgment as contemplated by the Stipulation, which would then merge with the underlying claim. *See, e.g., Accubid Excavation, Inc.,* 188 Md. App. at 229-39, 981 A.2d at 736-41 (subsequent claims for contract-based attorney's fees barred once contract merged into judgment).

[15] Another provision of the FCRA, 15 U.S.C. § 1681t(b)(1)(F), could be read to preempt *all* state law claims. District courts, including in the District of Maryland, have adopted the "statutory approach," under which state statutory claims are preempted by § 1681t(b)(1)(F), but state common law claims (such as defamation) are governed by § 1681h(e). *See, e.g., Meaney v. Nationstar Mortg.,* TDC-16-2959, 2018 WL 1014927, at *13 (D. Md. Feb. 21, 2018); *Magruder,* 194 F. Supp. 3d at 389-91; *White v. Green Tree Servicing, LLC,* 118 F. Supp. 3d 867, 872 (D. Md. 2015); *Davenport v. Sallie Mae, Inc.,* PJM-12-1475, 2013 WL 4010983, at *5 (D. Md. Aug. 2, 2013); *Beuster v. Equifax Info. Services,* 435 F. Supp. 2d 471, 478 (D. Md. 2006). Neither plaintiff nor APG raises this issue.

[16] The defendant in *Summit Loans* contested this version of events, but at the procedural posture in question, the court assumed the truth of the testimony of the non-moving party. 265 Md. at 46, 288 A.2d at 115.

162